# No. 26-830

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

### SAIFULLAH KHAN,

*Plaintiff-Appellant,*

*v.*

### YALE UNIVERSITY,

PETER SALOVEY, JONATHON HALLOWAY, MARVIN CHUN,
JOE GORDON, DAVID POST, MARK SOLOMON, ANN KUHLMAN,
LYNN COOLEY, PAUL GENECIN, STEPHANIE SPANGLER,
SARAH DEMERS, JANE DOE, CAROLE GOLDBERG,
AND UNKNOWN PERSONS,

*Defendants-Appellees.*

*ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT*

(*Dooley, J.*), *No. 3:19-cv-1966* (*KAD*)

## Appendix

**Volume II of II — Pages A-268 to A-397**

Alexander T. Taubes, Esq.
LAW OFFICES OF ALEXANDER T. TAUBES, PLLC
470 James Street, Suite 007
New Haven, CT 06513
Tel. 203-909-0048
Email: alextt@gmail.com

## TABLE OF CONTENTS

### VOLUME I OF II (A-1 – A-267)

District Court Docket Sheet, No. 3:19-cv-1966 (KAD).......................................................A-1–A-60

Complaint, Dec. 13, 2019 (ECF No. 1)...............................................................................A-61–A-88

Motion to Litigate Against Jane Doe Under a Pseudonym, Dec. 13, 2019 (ECF No. 2)A-89–A-99

Mandate of the United States Court of Appeals for the Second Circuit, No. 21-95, Nov. 15, 2023 (ECF No. 65).................................................................................................................A-100

Motion of Defendant Jane Doe for Protective Order (redacted), Mar. 4, 2024 (ECF No. 81) .................................................................................................................................. A-101–A-102

Motion to Vacate Order Treating Jane Doe Pseudonymously, Mar. 15, 2024 (ECF No. 89) .................................................................................................................................. A-103–A-110

Sealed Motion of Defendant Jane Doe to Continue Anonymity, Apr. 5, 2024 (ECF No. 103) — see Note 2........................................................................................................................A-111

Amended Answer and Affirmative Defenses of Yale University, Apr. 12, 2024 (ECF No. 107) .................................................................................................................................. A-112–A-123

Plaintiff's Local Rule 72.2 Objection to ECF No. 119, July 3, 2024 (ECF No. 152)....A-124–A-136

Plaintiff's Supplement to Rule 72.2 Objection, July 4, 2024 (ECF No. 154)...............A-137–A-143

Plaintiff's Objection to Second Emergency Motions to Dismiss (public cover), July 6, 2024 (ECF No. 157 — see Note 5)........................................................................................A-144–A-145

Plaintiff's Memorandum in Opposition to Second Emergency Motions to Dismiss (public redacted refiling), Aug. 5, 2025 (ECF No. 383; refiling of sealed ECF No. 157-1 — see Note 5)......................................................................................................................A-146–A-171

Plaintiff's Emergency Supplement to Rule 72.2 Objection, Nov. 18, 2024 (ECF No. 226) .................................................................................................................................. A-172–A-201

Defendants' Third Motion for Judgment of Dismissal (public version), May 20, 2025 (ECF No. 332)..................................................................................................................A-202–A-238

Sealed Motion of Defendant Jane Doe for Judgment of Dismissal, May 20, 2025 (ECF No. 333) — see Note 2..................................................................................................................A-239

Plaintiff's Response to the Third Motion for Judgment of Dismissal (public redacted refiling), June 27, 2025 (ECF No. 368; refiling of ECF No. 364 — see Note 4)...............A-240–A-262

Motion of Defendant Jane Doe for Leave to File Supplemental Brief, July 10, 2025 (ECF No. 371) .................................................................................................................................. A-263–A-265

Minute Entry, Evidentiary Hearing, Dec. 22, 2025 (ECF No. 395)........................................A-266

Notice of Appeal, Apr. 1, 2026 (ECF No. 401)........................................................................A-267

### VOLUME II OF II (A-268 – A-397)

Transcript of Motion Hearing (Dooley, J.), hearing held Mar. 18, 2024 (ECF No. 94) .................................................................................................................................. A-268–A-293

Transcript of Evidentiary Hearing (Dooley, J.), hearing held Dec. 22, 2025 (ECF No. 397) .................................................................................................................................. A-294–A-397

i

## SPECIAL APPENDIX (separately filed pursuant to Local Rule 32.1.1(c))

Memorandum of Decision granting the Third Motion for Judgment of Dismissal (Dooley, J.), Mar. 27, 2026 (ECF No. 398) — the decision appealed from........................SPA-1–SPA-31

Judgment, Mar. 30, 2026 (ECF No. 400)................................................................................SPA-32

Electronic Order granting Motion to Proceed Pseudonymously "without prejudice," Jan. 10, 2020 (ECF No. 12) — see Note 3...................................................................................SPA-33

Minute Entry and Bench Order (Dooley, J.), Mar. 18, 2024 (ECF No. 91).........................SPA-34

Ruling and Order on Anonymity Motions (Garcia, M.J.), June 19, 2024 (ECF No. 119) ....................................................................................................................SPA-35–SPA-50

Electronic Order re Official Transcript (Garcia, M.J.), Oct. 21, 2024 (ECF No. 216) — see Note 3 ...............................................................................................................................SPA-51

Order, In re Khan, No. 24-2794 (2d Cir. Nov. 15, 2024) (denying mandamus; certified copy) ...............................................................................................................................SPA-52

Electronic Order re Rule 72.2 Objections, Nov. 21, 2024 (ECF No. 232) — see Note 3......SPA-53

Electronic Order re Status Conference (Garcia, M.J.), Jan. 23, 2025 (ECF No. 262) — see Note 3 ...............................................................................................................SPA-54–SPA-55

Memorandum of Decision denying Emergency Motions to Dismiss (Dooley, J.), Jan. 29, 2025 (ECF No. 265)..................................................................................................SPA-56–SPA-72

Electronic Order re June 16, 2025 Post, June 23, 2025 (ECF No. 354) — see Note 3...........SPA-73

Electronic Order denying Motions to Compel as Moot (Garcia, M.J.), Mar. 27, 2026 (ECF No. 399) — see Note 3...................................................................................................SPA-74

Relevant Constitutional, Statutory, and Rule Provisions: U.S. Const. amend. I; 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 37(b)(2)(A); Fed. R. Civ. P. 72(a)...........................SPA-75–SPA-76

**Notes**

1. The contents of this Appendix conform to Fed. R. App. P. 30(a)(1) and Local Rule 30.1. Pursuant to Local Rule 32.1.1(c), the decision appealed from, the judgment, the principal orders under review, and the text of significant rules of law are reproduced in a separately filed Special Appendix, paginated SPA-1 through SPA-76.

2. Sealed documents. ECF Nos. 103 and 333 were filed under seal in the district court and are not reproduced in this public Appendix; each is represented by a captioned placeholder page, and the sealed entries appear on the docket sheet at A-1–A-60.

3. Docket-text orders. Certain orders of the district court were entered as text on the docket with no separately filed document. Each such order is reproduced verbatim from the official docket report on a captioned page in the Special Appendix.

4. ECF No. 368. The document at A-240–A-262 is the public redacted refiling (ECF No. 368) of Plaintiff's sealed Response (ECF No. 364); citations in the brief to ECF No. 364 refer to this document.

5. ECF No. 383. Plaintiff's memorandum in opposition to the second emergency dismissal motions was filed under seal as ECF No. 157-1 behind the public cover at A-144–A-145, and was refiled in redacted public form as ECF No. 383 (Aug. 5, 2025). The document at A-146–A-171 is that public version; citations in the brief to the memorandum refer to it.

```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF CONNECTICUT


_____
SAIFULLAH KHAN,                     )
               Plaintiff,           ) No: 3:19-cv-1966-KAD
                                    )
       v.                           ) March 18, 2024
YALE UNIVERSITY, ET AL.,            )
               Defendants.          ) 9:57 a.m.
_____)
                                      Brien McMahon Federal Building
                                      915 Lafayette Boulevard
                                      Bridgeport, CT 06604




                         MOTION HEARING




B E F O R E:
        THE HONORABLE KARI A. DOOLEY, U.S.D.J.
```

Courtroom Deputy:                      Official Court Reporter:
Kristen Gould, Esq.                    Tracy L. Gow, RPR

Chambers: 203.579.5522

**A-268**

2

```
A P P E A R A N C E S:
For the Plaintiff:
     NORMAN A. PATTIS, ESQ.
     Pattis & Associates, LLC
     383 Orange Street, First Floor
     New Haven, CT 06511
     203-393-3017
     Email: npattis@pattislaw.com

For Defendant Yale University:
     GIOVANNA T. WELLER, ESQ.
     Carmody, Torrance, Sendak & Hennessey, LLP
     50 Leavenworth Street
     P.O. Box 1110
     Waterbury, CT 06721-1110
     203-573-1200
     Email: gweller@carmodylaw.com

For Defendant Jane Doe:
     BRENDAN GOOLEY, ESQ.
     JAMES M. SCONZO, ESQ.
     Carlton Fields
     One State Street
     Suite 1800
     Hartford, CT 06103
     860-392-5036
     Email: bgooley@carltonfields.com
            jsconzo@carltonfields.com

Also Present:
     SAIFULLAH KHAN, Plaintiff
```

**A-269**

(Call to Order, 9:57 a.m.)

THE COURT:  All right.  Good morning, everybody.  We are here on the matter of Khan v. Yale University, et al.

Counsel, please identify yourselves for the record.

MR. PATTIS:  Norm Pattis, on behalf of Mr. Khan, Judge.

THE COURT:  Good morning, Mr. Pattis.  It's been a while.

MR. PATTIS:  Good morning, Judge.  Good to see you.

Yeah, I know.  I was just saying to my colleagues that I hadn't been in this building since before the pandemic.

THE COURT:  It's --

MR. PATTIS:  And I've missed it.  So it's good to be back.

THE COURT:  Welcome back, Mr. Khan.

MR. GOOLEY:  Your Honor, Brendan Gooley, on behalf of Defendant Jane Doe.  With me is Attorney Jim Sconzo; and Attorney Giovanna Weller, who represents Yale.

MR. SCONZO:  Good morning, Judge.

MS. WELLER:  Good morning, Your Honor.

THE COURT:  All right.  I had scheduled oral argument on Jane Doe's Motion to Dismiss that is premised largely on Mr. Khan's disclosing of her identity on social media and some activity that flowed from that.

Since then, I think other -- the issues that are probably implicated a little bit in the Motion to Dismiss have been the subject of a additional motions, which we are not taking up today, and that is Jane Doe's motion for a protective order, restricting and limiting Mr. Khan's access to and use of certain information, as well as a motion by Mr. Khan to remove the pseudonym of Jane Doe, largely because the reasons he had sought the pseudonym at the beginning was out of respect or concern for Yale's Title IX procedure, which is no longer a concern.

We're not going to resolve those issues today, and I think I'm going to ask -- first of all, they're still being briefed. And once they are fully briefed, or maybe even before they're fully briefed, I'm going to ask that all of those issues be taken up by one of our magistrate judges, who will in due course.

Turning back to the Motion to Dismiss. I think some procedural background is helpful. As I indicated, Mr. Khan had filed, initially, the request for a pseudonym for Jane Doe at a time when he indicated he was still perhaps interested in pursuing and returning to Yale to get his degree. And out of recognition of their Title IX procedures and the confidentiality of those procedures, he sought a pseudonym for Jane Doe.

He analyzed the factors, the Second Circuit factors,

5

from "In re: Sealed Plaintiff" sort of through his lens, through his eyes, and how those factors impacted his interest.

Ordinarily, when a pseudonym is being contemplated, it's through the interest for the person for whom the pseudonym is going to be used.  And, so, Yale chimed in on the motion for a pseudonym, and agreed, but sort of did it through the eyes of Jane Doe as the accuser in the Title IX proceedings.

And I granted the motion and ordered that all pleadings and references to Jane Doe would use that appellation throughout the litigation.

That was the only order I had entered.  Jane Doe had not appeared at that time.  There was no request for a protective order in terms of the use of her name, and I certainly didn't  sua sponte issue a prior restraint with respect to anybody as to Jane Doe's identity.

So, with that background, I don't think -- and you can tell me why I'm wrong -- I don't think that there would be a basis at this juncture to dismiss the claims that Mr. Khan brings for violating the Court's order; and if I've missed something or there's an order there that did what I -- created a situation where he would be precluded from doing what he has since done, then, by all means, share that with me.  But I don't see that on this docket.

6

That said, I do have some concerns. Attorney Sconzo.

MR. SCONZO: Thank you, Your Honor. Good morning.

I hear what Your Honor says, but the consequence of that would be that any litigant, then, could obtain such an order and basically go worldwide and disseminate the name of the person for whom they seek anonymity in this court. So there'd be no reason for the order, so to speak.

And I would say this, too, that before --

THE COURT: But the protection that it affords is in the confines of the litigation and public access to the docket and who can look at the docket and know who the players are.

I have not found a single case that says an anonymity order serves as a prior restraint. I just haven't found it, Attorney Sconzo.

MR. SCONZO: I would say this, Judge. Well, I think that's how the parties in this district have always viewed this -- and, in fact, before what Mr. Khan did, Attorney Pattis and I had been speaking candidly with each other, and he had said, Jim, you know, we're going to move to remove that order; and I said, in effect, Sure, you know, do what you need to do, we'll respond to it.

So I think, in candor, even Attorney Pattis would have to concede that nobody envisioned once this order

**A-273**

attached, that a litigant could take an end-run and disseminate a name for whom they sought anonymity in this case.

So, I do understand what Your Honor is saying, and I do understand that you did not make an order against prior restraint. But the disclosure of the name in this case came after Mr. Khan sought anonymity of the name and the disclosures, as we've shown, Your Honor, all related to litigation. It's not as though he wrote some poem with her name in it. His disclosures are all defined by this litigation and directed to this litigation.

So it seems to me, if there's no sanction for this, then any litigant who obtains such an order will just ignore it and go and say, Well, I didn't file a pleading so I can use that name wherever I want.

MR. PATTIS: May I address the Court, Judge?

THE COURT: You may.

MR. PATTIS: This is going to be a long piece of litigation, and I think that our candor toward you and respect to one another matters, because this is our first time before you.

Everything Attorney Sconzo said is true. I have represented Mr. Khan since 2015, since he was first arrested, I represented him in the 2018 trial and we've presented him through the various appellate proceedings. It is I who

8

drafted the complaint. It is I who sought the protective order on his behalf. And it was our understanding at that time that we would be governed by Yale process, as it were, which was to keep anonymity of the complainant. And, frankly, it was the Supreme Court's decision that sort of -- and it's conclusion about the application of the honor code to her -- to Jane Doe, that tipped the balance.

It was my expectation that we were going to file something with this Court. In listening to you, I'm thinking, Jeez, I'm not half as good a lawyer as I thought because that was a defense that wasn't raised, but it's because it was an issue I didn't --

THE COURT: Slow down.

MR. PATTIS: It was a defense I didn't raise because it's an issue I didn't see. I saw it as Attorney Sconzo did, and I did provide him notice that we would be seeking relief from the order.

So I appreciate the Defense, and I appreciate the concern about prior restraints, but I was operating as though the order applied where it may not have, and I wanted you to hear that from me.

THE COURT: Okay. Thank you.

I'll circle-back to where I was. What I have seen does give me concern about what's going on here, and some of the things that Mr. Khan has done that give me pause.

**A-275**

Because some of the tenor and tone of the posts feel less like his plan is to have his rights vindicated as it is to exact retribution, and that is not the purpose of the use of our courts or litigation generally.

When he has posted about the litigation and talking about attending depositions, there is a sense of an intent to intimidate. There is a sense of an intent to harass. The idea of sort of mobilizing the Internet -- I mean, this is borderline doxing, and it's very concerning.

The flipside of this -- I know that we have -- Mr. Khan has an interest, if I'm reading these attachments correctly, in challenging the structure of Title IX proceedings generally, separate and distinct from this litigation.

And I guess I would ask Attorney Sconzo or Attorney Gooley, the motion for protective order that you filed, that sort of seeks to achieve essentially what you're arguing should have been or already was in place. Is that a fair statement?

MR. SCONZO: Well, partly, Your Honor. I think that motion did not address the dissemination of the name, but that motion addressed the dissemination of disclosures made in discovery. So the name issue still, I think, remains the largest concern.

THE COURT: And that issue is teed up with

10

plaintiff's motion.  You would agree with that, I assume?

MR. SCONZO:  I would agree with that.  I would also agree with, we have a lot more to say on that.

THE COURT:  Okay.  Attorney Pattis, what is your client's plan?

MR. PATTIS:  When I have talked to Mr. Sconzo, to alert him we'd be filing a motion, it was my belief that we would be filing a motion, and I was awaiting some instruction from Mr. Khan.  And I have permission to discuss this with you.

His disclosure surprised me, and I think the word I used in one of my pleadings was "flummoxed," and led to discussions between he and I about whether the attorney-client relationship would continue, because my view is that orders of the court are orders of court, and I construed it strictly, and in ways that perhaps the Court doesn't think are necessarily justified on the pleadings. But that's how I saw it.

He, and for good reason, regards himself as the victim in this case, not Jane Doe.  They had a consensual experience, a jury vetted it, and Mr. Khan has been deprived of the promise that Yale made him for a bright future in the country of his adoption by using a procedure that might best be described as a "kangaroo court," and encouraging and enabling a young woman to come forth and lie about him to the

world, and now she seeks the protection for the consequences of her action.

Now, the Court may say that his purpose is revenge and revenge is inappropriate. Accountability is not. And to the degree that he will seek punitive damages, those are to punish and deter, and deterrence is a uniquely personal function.

So I think he wants her to feel what he felt. What it was to have every publication that reports on things like that, like Time Magazine reported him to be a rapist, when, in fact, what he did was engaged in what one headline writer called "messy sex." And sex, typically, when it's consensual among people above a certain age, may be messy, but it's not a crime.

And, so, for reasons of her own, and for reasons of a highly-mobilized political group, Mr. Khan was held out to be a criminal and had to fight for his liberty, and he won. And when he went back to Yale, the anger was mobilized and they forced him to the street, and he's lost the promise. I remind you, he was recruited from a refugee camp in Pakistan -- or Afghanistan, rather -- and came to the United States, educated at Yale's expense. He does want retribution. His future was stolen from him.

Now, having said that, I'm in a tough spot on the "prior restraint" issue because I don't think this does come

12

close to doxing, and I know a lot about that from the Alex Jones case in the state court, where there is a new theory in the defamation cases called "stochastic terrorism," which is, in an interconnected digital universe, a defamatory remark placed in the right context will inflame the online world.

You know, I don't see that Mr. Khan is responsible for the interest the public has taken in this case. The interest the public has taken in this case goes to the very injury or the harm he's suffered. In the eyes of many, he's a rapist because she said he was, and it's never been shown.

So I hear what you're saying, Judge. What we've come to court -- Mr. Khan has recently had jaw surgery. He's able to speak. It's a little difficult. I told him to expect a rebuke from the Court and to be put -- that he would be placed on notice that further misuse of court material would not be tolerated and would come with consequences.

I hear the Court saying that it may not be prepared to drop that hammer yet. But I think his intentions are to fully and fairly --

THE COURT: Still thinking about it.

MR. PATTIS: Well, I hear you.

But, I mean, I think that his intentions -- finally, to answer your question -- are to fully and fairly litigate this case and bring it to a jury. I've explained to him that any other questions about his compliance with court orders

could cost him my representation of him, because it'll raise questions about my credibility.

And, candidly, there was discovery mishap in the Jones case that in state court had cost me a suspension that is still being litigated in the appellate courts. I'm uniquely sensitive to these issues, and Mr. Khan knows it.

So his intentions are to obey your orders, but to fight hard to vindicate his claims.

MR. SCONZO: Judge, may I be heard just briefly.

THE COURT: Of course.

MR. SCONZO: I see an merging notion in this case that Mr. Khan was vindicated. Mr. Khan was found "not guilty" in a criminal standard, in a criminal court. Nothing has been decided in a civil context, and I want to make that clear. Mr. Khan was dismissed from Yale on a standard far different than a criminal process for rape, and he has not proven that my client lied, and I need to put a stop to this notion I see building momentum that he's been vindicated.

He's not be vindicated of anything, Judge. The only charge he's been absolved of by a jury is that the State did not prove beyond a reasonable doubt that he raped my client. That is it. The rest is yet to be determined.

THE COURT: All right. I agree. And I think that that puts a finer point on the concerns that I have. I mean, obviously, Mr. Pattis, I'm sure you're going to have a

conversation with your client about his own exposure as he publicly accuses, outside the confines of a courtroom, when he publicly accusing her of a false accusation.

What I don't want -- because Mr. Sconzo is correct. This case is going to be decided on the basis of the allegations, presumably to a jury who will have to make a determination not beyond a reasonable doubt, but by a preponderance of the evidence whether or not it was a false accusation.

And we will get the case there. We had a few starts and stops as it bounced around various appellate courts. It found its way back. But what I don't want, I don't want the case litigated on X or on Youtube or on TikTok. That just can't happen. That starts to infect the entire process, and if I -- and I think I do have a legitimate concern that that might be on Mr. Khan's list of things to do, in terms of having his viewpoint out there in the world repeated to the Jane Doe's detriment, at a time when nothing has been decided. That's what I'm concerned about.

MR. PATTIS: So, Judge, I understand the Court's concerns. And this was a subject of litigation, on the basis of a special public interest appeal to the Connecticut Supreme Court in the case of State of Connecticut v. Fotis Dulos, and I would ask you to consider looking at the briefs there. That was a case involving the serious death of a

15

mother of five children. I believe his co-defendant, Michelle Troconis, just had a verdict.

I represented Mr. Dulos, who wanted an aggressive presentation of his defense and questions about it raised in the press, given the extraordinary interest the press had taken in the case, so we did so. The State moved for a gag order, and the Court issued one. We got the Connecticut Supreme Court to grant a special public interest appeal, because it was our understanding that the prohibition against potentially prejudicial pretrial publicity was limited to those circumstances in which it was likely to not have an influence on the jury, and that remarks distant in time by a nontrial -- by a nonlawyer were protected speech, and that what the Court had engaged in the Dulos case was a gag order.

We never got a decision on that case because Mr. Dulos committed suicide. But it is a -- given the way that the waves are breaking in here today, that's an issue that might well come before this Court. And it may be, that as the Court considers its own comfort level with the conduct of litigants here and what is to come next, that the Court may request briefing on that issue. It would be an easy enough thing, for me certainly, to re-tool the Dulos brief, because I think there are legitimate issues in there.

You know, there is an inherent authority for courts to regulate the conduct of trial participants. We saw that

**A-282**

16

in another public-interest appeal I handled involving Mr. Jones' speech about trial counsel in the Sandy Hook case on his broadcast. The Court did issue a decision in that case. We took certiorito the United States Supreme Court on that, and it was denied.

All of which to say, I think that the extra-judicial statements of non -- of non-counsel trial participants are protected speech unless it can be shown that they're imminently likely to cause prejudice to the jury. And we're so far out, I don't think he should be kept -- he should be ordered to not speak about the case. And if he seeks to try it on X or Youtube, the normal rules with respect to defamation and so forth would apply.

I'm not sure that the Court has authority to bar commentary about a case prior to his coming to trial. The case isn't even scheduled for trial yet, as near as I can tell.

So it I think there are issues here that the Court's going to potentially have to grapple with, and I recite these other cases only because a lot of time and effort went into briefing them and it might provide the Court with something to think about.

THE COURT: Attorney Sconzo.

Thank you, Attorney Pattis.

MR. SCONZO: I respect what Attorney Pattis is

**A-283**

saying, but I think he's jumping the gun here. We were motivated by what we saw -- and I think Your Honor commented on this a few moments ago -- what we saw was retaliatory action. The comments were, in our opinion -- and we set the sequence up in your briefing. They started with -- it's a retaliatory sequence of events starting with e-mails directly to my client that were found harassing, after he had sought to hide her name.

So it's not that we have taken the position in our motion that he can't speak about the case. We haven't even got there yet. What we have said is he's used her name publicly after telling the Court that he wouldn't do that, and the Court entering an order to that effect, and then harassing my client and using her name publicly, telling the world "a gift is going to come," and sure enough he does this.

So it's not quite as Attorney Pattis is portraying. I don't think we're there yet. We're in the immediacy of this harassing, vile conduct that does need to be addressed, Your Honor, and we'd be happy to brief it further. But the conduct is vile and out-of-bounds, and I've been doing this a long time, Your Honor.

MR. PATTIS: Judge, I have too, and "vile" doesn't even come close to it. This isn't even close to vile or harassing. If somebody brings a suit against me and I

18

comment on them, "I can't wait to see you in court," and I pose their name online, that's vile?  That's harassing?

I mean, that's too tender, by far, for a regime governed by First Amendment protections.

MR. SCONZO:  It's vile, Your Honor, when he knows full well the platform he's using to do this, the setup that he's using, and then what has happened.  And we showed Your Honor what has happened -- "the Nazis have taken this," "the fringe element has taken this," that's exactly what he intended and he's gotten his intention.

MR. PATTIS:  And this is the brave new world of stochastic terrorism.  And, you know, I don't know that the First Amendment -- I mean, I'm reasonably confident that nobody contemplated social media, and I'm reasonably confident that our times have become unhinged.

You know, I've recently tried a case, Judge, for six months in D.C., involving the Proud Boys.  And what I saw in the courtroom didn't correspond to what appeared online from both the right and the left.  And, so, I recognize that social media has created this inflammatory tinderbox, where any spark can light a fire.  But I don't think that the person who lights the spark is intentionally -- or, is responsible for the fire, absence a showing of intent to do so.  And merely asserting that he must have had that intent because it occurred is  post hoc ergo propter hoc

**A-285**

19

THE COURT: Well, I think there's certainly language that your client shows from which a reasonable inference could be drawn that he was looking to set the spark or he was looking to visit upon her something similar to what has been visited upon her.

MR. PATTIS: I don't know that anything has. I mean, you know, I endured the Sandy Hook defaults trial for Alex Jones, and they brought in an expert on digital imprint and stochastic terrorism, and then they brought on the family to talk about the contact that was made in that. Because there was a default entry, causation was established. And so it was assumed that when a drop -- when a pebble was dropped in an ocean, every ripple was the responsibility of Mr. Jones. The plaintiffs never had to prove that. And the plaintiff -- or the defendant in this instance never even tried.

THE COURT: Well, I'm not -- I'm not going to dismiss the case. I think that, consistent with the parties' earlier understanding, with the issues now I think adequately joined between the motion to remove the pseudonym and the motion for the protective order, what the parties' conduct looks like going forward is teed up.

I am going to direct -- I suppose you can take an immediate appeal to the Second Circuit if you'd like, Attorney Pattis, but I am going to direct Mr. Khan not to at

**A-286**

20

least use Jane Doe's real name in his social media communications until such time as all of those motions are adjudicated by the Court.

And, Mr. Pattis, I would ask you to ask your client whether he has any concern about following that order.

MR. PATTIS: May I have a moment, please?

THE COURT: Yes.

(Conferring.)

MR. PATTIS: Judge, I had a chance to speak to Mr. Khan, and he said, What is it exactly that the Court is saying? And I said I understand it to say the following: That unless and until there is a ruling on a series of motions related to the anonymity order, that he is not to use Jane Doe's name in any social media posting or publish -- publications to the world; and what's more -- I went a little further than what I thought I heard the Court say, and that he should take down any that he has control over right now.

He -- and he understands that, and he would like to address you himself, Judge.

THE COURT: Okay.

MR. KHAN: Good morning, Your Honor.

THE COURT: Good morning.

MR. KHAN: Apologies for the mask. I am at risk for infection.

THE COURT: No apology necessary.

**A-287**

21

MR. KHAN: Your Honor, I have never harassed Jane Doe, the various characterization. Although I'm not privy to what Attorney Sconzo has been saying because of the sealed nature of the motions, my intention has never, as you said, with the tenor of my posts, has never been to intimidate or harass anyone. It's merely to conduct a robust discovery.

And my interpretation of what the Second Circuit said in Footnote 1, Brief 3, and what the Supreme Court said in Footnote 39, and on those two bases I -- yes, I completely apologize. I jumped the gun, I misunderstood, and I profusely apologize, and I will completely abide by any punishment or order that the Court gives me.

As my mom used to say, the English equivalent is "no good deed goes unpunished" -- simply, abiding by the Yale confidentiality policy. I should have just sued her under the name originally and fought this back then. I'm sorry for this.

I -- in 2015 until 2018, at the Superior Court with Judge Blue and Judge Fischer, I complied with all of the laws; at the Yale Title IX policy, I complied with all of the laws; and in the various bouncing around from District, to Second, to Supreme, I've complied with all of the laws of Your Honor, including the requests of Attorney Sconzo -- including, yes, when -- there have been three contacts between me and Jane Doe:

One, I had my attorney request settlement discussion from Attorney Sconzo, and they did it by phone -- they had no appetite.  I don't consider that harassment.

The second was -- I looked it up.  I thought that, while attorneys are not allowed to contact opposing clients, it didn't -- it said that it's okay for clients to do so, as long as it's respectful.  I carbon-copied Attorney Sconzo on that e-mail.  When I was told by Attorney Sconzo to never contact her again, I obliged.  I have not done so.

And the third time was I got -- the situation again changed over the years.  I e-mailed Attorney Sconzo directly.  He considers that harassment again.  In none of those things have I been intending to harass or intimidate anyone.

And, so, if Your Honor would like to, for lack of a better word, put a gag order on me, I will completely oblige.  I will do exactly as you say.

MR. PATTIS:  Objection.  We're not going to -- we're not completely oblige to any gag orders, Mr. Khan.  Speak to me before you offer to comply with gag orders to the Court.

MR. KHAN:  I'm saying, if Your Honor -- I don't know the laws here, I'm still not a citizen yet, but I will seek whatever judicial -- I will always comply with the law.

I come from a lawless country, and I have tremendous respect for this court, and I'm just seeking justice for the pain that the client caused me -- and Yale.  It'll take me

nine more years, I don't care. I'm sorry for --

THE COURT: It's all right.

MR. KHAN: Thank you.

THE COURT: All right. I think that -- well, let me ask, Attorney Weller: Does Yale have anything to add to this landscape?

MS. WELLER: I'm sorry, Your Honor. Can you repeat the question?

THE COURT: Did Yale have anything they wanted to add to this landscape?

MS. WELLER: No, Your Honor, not at this time.

THE COURT: All right. Thank you.

I think that the motion for protective order is broad enough in its contours that I think, in terms of Mr. Khan's access to and use of discovery in this case, which obviously will include Jane Doe's true name, and the motion regarding removing the pseudonym, when fully briefed will, I think, allow for a complete vetting of all of the issues that have been decided -- or discussed, or sort of identified here this morning.

Until those motions are adjudicated, I'm going to direct that Mr. Khan sort of abide by the status quo that was the parties' understanding as to the impact of the pseudonym order, which means, Mr. Khan, I'm going to direct you not to publicly identify her again on social media or elsewhere

24

until those rulings are issued.

In large respect, Attorney Sconzo, Attorney Gooley, as you know, once something is on the Internet, it's very difficult to scrub. It's probably impossible to scrub. So there's nothing I can do about that vis-a-visMr. Khan or otherwise, frankly.

Was there anything -- I'm not sure that there's anything else we can do. I am going to deny the Motion to Dismiss for the reasons I've already indicated.

Anything else we can do with respect to Mr. Khan, Attorney Pattis?

MR. PATTIS: Not today, Judge.

THE COURT: Thank you.

Attorney Sconzo.

MR. SCONZO: Just one thing on the last point, Your Honor, and I think Attorney Pattis was prepared to do this. Could Your Honor at least order that Mr. Khan take down what he's posted? I understand you can't order that people who repost take theirs down, but you certainly could direct Mr. Khan to take down his posts.

THE COURT: Yeah, I don't -- I don't under -- I don't pretend to have a full understanding of Mr. Khan's social media presence. Are we talking about a Facebook page, a Twitter -- an X account? Where -- is there a particular situs that Mr. Khan generally posts to? What's your

**A-291**

25

understanding, Mr. Sconzo?

MR. SCONZO: My understanding is -- and I'm not that savy with this stuff, but my understanding is it's on X.

THE COURT: Okay.

MR. SCONZO: And that's what I'm directing my comments toward.

THE COURT: Attorney Pattis, is there any objection to her name being removed until such time as those motions are adjudicated?

(Conferring.)

MR. PATTIS: Judge, Mr. Khan is willing to take down any posting her name on X or any other account under which he has the ability to do so.

What?

(Conferring.)

MR. PATTIS: He is willing to do so because of respect for your orders, but he won't do so at Mr. Sconzo's direction. He would do so if that is the order of the Court.

THE COURT: Then that is the order of the Court.

All right. Anything else we can do, from Jane Doe's perspective?

MR. SCONZO: No. Thank you very much, Your Honor.

THE COURT: All right. Thank you for coming in, Counsel.

**A-292**

26

MR. PATTIS:  Thank you, Judge.

(Proceedings conclude, 10:35 a.m.)


C E R T I F I C A T E

RE:  Khan v. Yale, et al.
Civil No. 3:19-cv-1966-KAD

Motion Hearing
March 18, 2024


I, Tracy L. Gow, RPR, Official Court Reporter for the United States District Court, District of Connecticut, do hereby certify that the foregoing pages, 1 through 26, are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


/s/   TRACY L. GOW
Official Court Reporter
U.S. District Court
915 Lafayette Boulevard, Room 216
Bridgeport, Connecticut 06604
(203) 910-0323

A-293

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - x
                                  :
SAIFULLAH KHAN,                   :   No. 3:19CV1966(KAD)
                                  :
              Plaintiff           :
                                  :
         v.                       :
                                  :
YALE UNIVERSITY, ET AL.,          :
                                  :   Bridgeport, Connecticut
              Defendants          :   December 22, 2025
                                  :
- - - - - - - - - - - - - - - - - x
```

<u>MOTION HEARING</u>

B E F O R E:

     THE HONORABLE KARI A. DOOLEY, U.S.D.J.

Diana Huntington, RDR, CRR
Official Court Reporter

**A-294**

A P P E A R A N C E S:

    FOR THE PLAINTIFF:

        ALEXANDER T. TAUBES, ESQ.
        470 James Street
        Suite 007
        New Haven, Connecticut 06513

    FOR THE YALE DEFENDANTS:

      CARMODY TORRANCE SUNDAK & HENNESSEY LLP
        50 Leavenworth Street
        P.O. Box 1100
        Waterbury, Connecticut 06721
      BY:  GIOVANNA T. WELLER, ESQ.

      CARMODY TORRANCE SUNDAK & HENNESSEY LLP
        Concept Park
        741 Boston Post Road, Suite 306
        Guilford, Connecticut 06437
      BY:  PATRICK M. NOONAN, ESQ.

      CARMODY TORRANCE SUNDAK & HENNESSEY LLP
        195 Church Street
        P.O. Box 1950
        New Haven, Connecticut 06509
      BY:  MARIA LAURATO, ESQ.

    FOR DEFENDANT JANE DOE:

      CARLTON FIELDS
        One State Street
        Suite 1800
        Hartford, Connecticut 06103
      BY:  BRENDAN GOOLEY, ESQ.
        JAMES M. SCONZO, ESQ.

**A-295**

**10:00 A.M.**

THE COURT: Good morning, everybody. This is the matter of Saifullah Khan v. Yale University, et al.

Counsel, please identify yourselves for the record.

MR. TAUBES: Good morning, Your Honor. This is Attorney Alexander Taubes for the plaintiff Saifullah Khan.

THE COURT: Good morning, Mr. Taubes. Good morning, Mr. Khan.

MR. GOOLEY: Good morning, Your Honor. Brendan Gooley on behalf of Defendant Jane Doe. With me is my colleague, Jim Sconzo.

MR. SCONZO: Good morning, Judge.

THE COURT: Good morning.

MS. WELLER: Good morning, Your Honor. Giovanna Weller for the Yale 12 individual defendants and Yale University. With me are my colleagues Pat Noonan and Maria Laurato.

MR. NOONAN: Good morning, Your Honor.

MS. LAURATO: Good morning, Your Honor.

THE COURT: Good morning.

Preliminarily, this is probably in excess of caution in the extreme. I am told that my current law clerk, Attorney Rathburn, attended Rutgers Law School, and

one of the named defendants, Mr. Halloway, I believe, was at some point a lecturer at Rutgers before he went to Yale.  And so I am disclosing that connection for what it's worth.  I don't think it has any import, but we always err on the side of providing those connections when they exist.  Obviously, if anybody has any concerns, they can let me know.

All right.  We are convened this morning on the defendants' third motion to dismiss as a sanction for litigation misconduct.  I instructed plaintiff, Mr. Khan, to be present, and I advised counsel that it is my intention to question him under oath subject, of course, to any valid privileges he may wish to assert.

Attorney Taubes, I assume you have had the opportunity to counsel your client on any of those issues.

MR. TAUBES:  That is correct, Your Honor.

THE COURT:  Thank you.

The motion is premised upon a number of alleged litigation abuses:  (1) that plaintiff has again indirectly disseminated Jane Doe's identity; (2) that plaintiff's production of largely irrelevant documents shortly before the scheduling of depositions was designed to delay this litigation; (3) plaintiff's false interrogatory responses; (4) plaintiff's wholly frivolous assertion of the attorney-client privilege with respect to

his communications with Peter Roe; (5) plaintiff's dishonesty with the Court; (6) plaintiff's taking of steps to invalidate medical releases, authorizations that he had signed; (7) plaintiff's failure to identify Dr. Favorite as one of his treatment providers. There are others. For example, the filing of discovery material that had been designated as confidential. Candidly, I am a little less concerned about that because I accept Attorney Taubes' representation that that was in fact an oversight by counsel and it was quickly remedied.

The consistent theme in all of this is that Mr. Khan finds ways to get what he wants even when he does so -- or I'm sorry, even when doing so would be contrary to the Court's orders.

In plaintiff's response to these allegations through the various briefs -- and I'll start by noting that the allegations are supported with affidavits, documents, and other evidence. Plaintiff offers largely only a counteroffensive. Plaintiff offers no evidence, no affidavits, and only speculation as to why plaintiff did what he did or did not do what he didn't do. The opposition utterly ignores the findings I have already made regarding Mr. Khan's motives and misconduct in this case. The opposition, frankly, and candidly, looks like it was written more by Mr. Khan as opposed to his lawyer.

Mr. Taubes, you have many cases on my docket.  I have never had reason to question your skills or your ethics.  But the reasonable inference to be drawn based on the record before me is you have no client control or you have subjugated your own professional judgment to the narrative your client wants put forth.

I don't know whether counsel have had an opportunity to discuss how this hearing should proceed. It was my intention to sort of give counsel an opportunity to address the issues and I think through that process we will identify factual questions that frankly only Mr. Khan can answer, if he so chooses.  So unless you all have had a conversation about how this proceeding should proceed, I think I would proceed in that fashion.

Any concern about that, Attorney Taubes?

MR. TAUBES:  No, Your Honor.

THE COURT:  Okay.  Attorney Gooley?

MR. GOOLEY:  That's fine by us, Your Honor.

THE COURT:  Attorney Weller?

MS. WELLER:  Yes, Your Honor, fine.

THE COURT:  All right.  In no particular order, we're going to start with the allegation that Mr. Khan intentionally manipulated others to disclose Jane's identity.  And on this issue, I think a little history is necessary.

The second motion to dismiss alleged just that, that he had been instructed not to directly or indirectly disclose Jane Doe's identity, and the allegation was that through his postings and his suggestions he got others to do it. And so we had a hearing and I looked at the evidence, and I concluded in a written decision that that's exactly what he had done. He had unquestionably posted on the internet in a fashion that was designed to get others to do what he could not. He disagrees with that. I understand that. But I already made those findings, and I stand by those findings. And for him five days after I issued that decision to do the exact same thing, something I have described as egregious litigation misconduct, is so in your face, it is Mr. Khan saying I really don't care what you say, Judge. I don't care what Judge Garcia says. I'm just telling you I'm allowed to vent. I'm allowed to share my displeasure that I am not allowed to identify her and I'm going to do that to the very people I know are going to do exactly that, put her name, perhaps her picture, all over the internet. So I don't -- the argument that he's just venting, well, that's the argument that was made and rejected last time. And Mr. Khan was put on notice, explicit notice that that will not be tolerated, and he did it again.

I don't have any suggestion that he didn't

understand the ruling. I don't have any suggestion that my ruling and decision was vague. I'm not often accused of being vague when it comes to things like this. I have only counsel's -- I don't even have Mr. Khan's denial. I have nothing from Mr. Khan. There's not an affidavit that sheds light on this. No, I have counsel's argument, the genesis of which I do not know, that that wasn't his intent and he's allowed to vent. What do I do with that?

Attorney Taubes, I'm happy to hear why I've got this wrong.

MR. TAUBES: Thank you, Your Honor.

So in regards to what happened five days after the Court's ruling on the second motion to dismiss, there was an interview that Mr. Khan had done many months prior to that. And that interview is with an individual -- and before I get any further, I might suggest that we might want to close the courtroom. And the reason for that is because I want to kind of explain some of the media that has covered this case and why things happen that are sometimes out of Mr. Khan's control, but I don't want to indirectly lead anyone to being able to discover Ms. Doe's name. It's actually very difficult because her name is very widely disseminated and publicized in a lot of different places, not by Mr. Khan. But the individual -- I can try and be more vague if the Court isn't inclined to

close the courtroom.

THE COURT: I don't think on this record I'm permitted to close the courtroom. The Local Rules are very clear I would have to post notice of my intention to do so and I would have to make very specific factual findings.

I'm going to direct you a little bit. I think I may have misspoke. The five days was the blogger interview.

MR. TAUBES: That was him posting -- you know, the blogger posted the blog interview at around that time. And he shared the interview of himself with his followers.

THE COURT: Okay.

MR. TAUBES: And so one thing that's really important to state -- and this video has been submitted to Your Honor as part of the record for the motion to dismiss -- is that the blogger who made that video and that interview does not use Ms. Doe's name at any point in the video. Mr. Khan does not use her name in that video.

THE COURT: Okay.

MR. TAUBES: And in the pleadings from the defense, there's a email from my client to this blogger saying let's set up this interview. Okay. That is when they first met, which was a while back. But what's important is he never said anything he was not allowed to

say to this person.

THE COURT: See, that's where you and I disagree. I had already found that when he says something that is designed to get others to do what he's not allowed to do, then he's not allowed to say it.

MR. TAUBES: But he -- he did not try to get this blogger to say her name, and she didn't.

Now, what happened was this blogger posts a video blog on YouTube, okay. The YouTube video gets over 1 million views. Mr. Khan, doing an interview with the person, doesn't know it's going to get a million views, but when it gets a million views there are then hundreds of people who comment mostly -- in fact, almost entirely anonymously underneath that comment. So it's really levels of separation away from Mr. Khan. Yes, Mr. Khan gave a person an interview.

THE COURT: You're not suggesting to me that Mr. Khan doesn't know how YouTube and the internet works and comments work.

MR. TAUBES: Well --

THE COURT: It's kind of his stomping ground.

MR. TAUBES: But he didn't know when this video was going to be posted or where it was going to be posted or how popular it was going to be.

THE COURT: What difference does that make? He

knew precisely what the reaction to his statements were going to be, the followers and the commenters and the internet world was going to post her name or her photo or -- I mean, that's why we had the second motion to dismiss. How can he -- first of all, he hasn't said anything. Is he going to take the stand and tell me all this? Or are you just going to advocate on what he tells you?

MR. TAUBES: He is prepared to testify today and to give his side of the story.

I think that if the Court had intended that he not be allowed to make any public comment about his case --

THE COURT: I didn't. And Judge Garcia didn't.

MR. TAUBES: But that's -- but that's -- that's the problem.

THE COURT: The commentary is I can't disclose her, I can't identify her; I have to be publicly named, she doesn't have to be publicly named.

We're not talking about the legal case or the legal theories or the ongoing litigation in some generic fashion. We're talking about his frustration with the fact that he's named and she's not. What -- seriously, he's going to take the stand and say I didn't think people would actually respond to that by posting her name? They

already did. We already have a ruling on it. We already had a second motion to dismiss on it.

MR. TAUBES: I was under the understanding that when -- that it was not the identical situation in the prior motion to dismiss.

THE COURT: It doesn't have to be an identical situation.

MR. TAUBES: I understand that.

THE COURT: Common sense tells us what we're talking about.

MR. TAUBES: I understand that. But at the point where he is not allowed to say her name and there is an order that he's trying to appeal regarding that, and there's not an order saying that he cannot discuss that pending motion before the Court, I don't believe that he can be held responsible for what other people choose to do, which they may do when they're confronted with this case and those issues. And the unfortunate fact is that the name is very, very easily readily accessible. And so when people Google his name --

THE COURT: Well, certainly from his followers, because he posted it on Christmas Day 2023 -- 2024.

MR. TAUBES: So that is very different. So if he had done that, I would be agreeing with you and he wouldn't even be my client. But that's not what he did.

What he did on Christmas Day is not what he did here. He gave an interview to the blogger months prior, many months prior. The blogger does what he's going to do to put his video together, to put together the clips and do all the editing. Months and months and months pass and it happens to come out at the same time that there's these rulings and these motions about the pseudonymity. If he complies with the order in not giving the blogger any document that identifies Jane Doe and the blogger does not identify Jane Doe --

THE COURT: Did he give the blogger any documents?

MR. TAUBES: I believe that he gave the blogger some documents but never anything that identified Jane Doe.

THE COURT: Did he give the blogger her photo?

MR. TAUBES: No, he did not give the blogger a photograph of Jane Doe or anything that would identify her.

THE COURT: What did he give the blogger?

MR. TAUBES: Public pleadings that are on the docket. Public pleadings that are on the docket. And he made very clear when the blogger asked him things that he could not give him information because of the Court's order. And he specifically told this blogger that there

are things I cannot provide to you because of the Court's order and I'm going to abide by the Court's order.

THE COURT: He's been giving lip service to the Court's orders for this entire litigation.

MR. TAUBES: Well, I've only represented this plaintiff since April of 2024. And I remember very distinctly when he hired me because my second child had just been born and I was very tired, but I decided to take on a case that would involve quite a bit of additional work. And throughout the time that I've had him as my client, I have not ever believed that it was his intention to break this Court's orders. And I would not just stand here and justify the breaking of this Court's orders. And in my experiences with him, he's been very careful. We've had many interactions with individuals -- you know, I've spent a lot of time with him. I've had interactions with him socially. And people come up to him and ask him questions about the case. He does not give people details about his case.

He -- one thing that I do know about him is that having gone through this experience he went through when he was in college where he was disciplined and ultimately expelled from school because of the allegations that are at the center of this case, that that -- being an attorney, I've met many other individuals who have been in

that same position. And there are many other individuals who I haven't met who have also been in that same position who come to Mr. Khan for help and for guidance. And he devotes many hours of his life helping other people, trying to help people get through a difficult time in their life. He has been through some difficult times during the representation. He's been in the ICE jail and tased in a courtroom.

He respects this country's courts and this country's laws a great deal. He does not want to be a violator of the Court's orders and laws and rules. And -- and we do not want to skirt anything that this Court has said or to play fast and loose with it. So he is here to testify today and he's ready to answer the Court's questions.

And, you know, there are other things that have happened that the other side has brought up which we haven't got into, many of which were my fault, Your Honor, and which are not his fault. He has not been trying to delay this case. He's not been trying to prevent this case from going forward.

THE COURT: We'll go through each of them one at a time.

Attorney Gooley, do you wish to be heard on this question?

**A-308**

MR. GOOLEY: Yes, Your Honor, thank you. I'll try to be brief.

We agree with what Your Honor said. Your Honor got it absolutely right. He didn't like Your Honor's order and he ignored it. And let me just walk through, briefly, the chronology.

On January 29 Your Honor issued the decision on our second motion to dismiss. The decision rejected the argument that I shouldn't be held in violation of the Court's orders because I was only effectively encouraging others to post Jane's name knowing that they would do so, my followers would do so because they had done so previously. Your Honor put in her decision a definition, multiple definitions, I believe, of what "indirectly" means. And "indirectly" was in Judge Garcia's order.

And then between February 1st, starting just a few days later, and February 17th he posted to those same followers who he knew would be willing to post Jane's name and had posted Jane's name and Your Honor had found he posted Jane's name this blog video four times, one time expressly making a comment on the post about naming the infamous Jane Doe. It's a complete disregard of Your Honor's order.

I'll contrast that, and I believe it was our reply brief, he had posted many months earlier a post to

the effect of I won't be posting anything at all for a while out of respect for the Court's order. He knew how to respect the Court's orders if he wanted to. He didn't. He did the exact opposite by doing exactly what this Court said is a violation of the order, inciting followers to post Jane's name. And they did. There were numerous posts on that video with Jane's name, all after plaintiff began posting that video. And that's one issue, right? That's one violation.

We also got into a separate violation which is what he actually gave to this blogger. And I want to just briefly address the facts of that.

So we get this blog post. I watch it and I happen to see the blogger post in the video -- and we gave Your Honor a screenshot of it -- an email plaintiff sent to the blogger offering to provide documentation. I know Your Honor saw it. I see Your Honor shaking her head yes, she saw that. And then I'm watching the video and I see video that's real video from this case of plaintiff and Jane from the night in question.

Now, plaintiff and his counsel have said repeatedly on this record in this court and in other courts that the exhibits from the criminal trial were long ago destroyed pursuant to the destruction status as a result of the acquittal in criminal court. So somehow

after plaintiff offered to provide documentation to this blogger, this blogger gets a video that has the plaintiff and Jane in it. And it -- I can tell you it didn't come from this side. Obviously, why would we produce that to the video? It didn't come from the court because it's been destroyed by the court. So how did he get it if not from the plaintiff?

Your Honor I think also hit this point on the head. They had every opportunity to submit evidence in response to their objection to say not me, Judge, swearing under oath which, by the way, I would say would not be sufficient at this point, and I can walk Your Honor down that road.

You'll recall Your Honor, I believe, herself found the plaintiff was dishonest with her when he addressed her personally, I think it was the second motion to dismiss hearing, ECF 200. So we certainly wouldn't accept that. But they didn't even do that. Instead, incredibly -- and Your Honor made this point but I think it's worth mentioning just again -- they said he's never done anything wrong. They said that in the face of Your Honor's memorandum of decision literally saying he did something egregiously wrong and sanctioned him for it. And that's why we're here, to use Your Honor's words, yet again because we have gone through this over and over and

over again, and we're still here hearing the argument that I didn't do anything wrong because I didn't literally post the name when we have a ruling from Judge Garcia that says you can't indirectly identify her, we have a full memorandum of decision from Your Honor that says "indirectly" means inciting followers to post the name. And yet days after that memorandum of decision drops we get four posts posting a video that repeatedly expresses, as they just admitted and the video shows, plaintiff's displeasure with the fact that, quote, his name is not out there.

THE COURT: His name is out there.

MR. GOOLEY: Sorry, yes. His name is out here there and her name is not out there. I misspoke, thank you, Your Honor. Sorry.

Anyway, that's, I think, the gist of it, but I'll...

MR. NOONAN: Your Honor, we don't have anything to add. We read your opinion. We understand it. So did Attorney Taubes. So did his client. He just told you that he's not going to abide by the Court's order. He hasn't yet. He doesn't intend to in the future because neither of them believe that you were serious. There is a way to make it serious. The case should be dismissed.

THE COURT: Attorney Taubes.

MR. TAUBES: I just want to respond to this notion that video came from our side. It did not. The video that they're talking about is in a BBC documentary that the blogger was able to cut clips out of, "Louis Theroux: The Night in Question," it's a BBC documentary about this case.

Mr. Khan is ready to testify. I'm thoroughly convinced he did not disclose anything inappropriate to the blogger. The blogger did not identify Ms. Doe by name. It was anonymous commenters under the blogger. And it's not even possible to draw the conclusion that those people would not have made those comments if Mr. Khan had not shared this video.

THE COURT: But he did share the video.

MR. TAUBES: But he shared --

THE COURT: He did share the video. It's his impetus to get his followers addressing his frustration, and we know how they do that.

MR. TAUBES: It's him getting his story out because one side of the story is that he committed rape, he's a sexual offender, and that obviously follows him everywhere he goes. And so he likes to get out his side of the story which is that he is not a rapist.

Now, as part of that, throughout his case he's highlighted what he has viewed and what some courts have

**A-313**

viewed as unfairness in the procedures that he has had against -- that he's had to face in trying to clear his name. And now he believes that one of those unfairnesses is the asymmetry of pseudonymity, which I have cases against the very same defendants where Yale has said it's unfair that there's a pseudonym --

THE COURT: But I'm not here to decide that issue, Mr. Taubes. That issue was decided. It is on appeal.

MR. TAUBES: Essentially, though, Your Honor, the crux of this is that if we're to view any comment by Mr. Khan on that issue as instructing his followers to violate the Court's order, then the order is a lot broader than what it states. If the Court's intention and belief is that anything he states about his case is going to result in people divulging the name, then the Court should simply say he cannot speak about the case.

THE COURT: I reject that argument, Mr. Taubes. He's not restricted from speaking about the case. He is restricted from quite intentionally, as I found before and I find on this record, he's reposting that video on the subject of pseudonymity because he knows the people who are going to see it are the exact same people who did what he wanted them to do last time, which is to publish her name.

A-314

MR. TAUBES: I respectfully disagree because the video is itself not about pseudonymity. The video came out at the same time that the pseudonymity issue was the next thing coming up in the case. But the video was about trying to clear his name and to rectify the damages to his reputation and to get his side of the story and to provide an example for others who have been accused that they can provide their side of the story. And anything he says about his case does result in people making comments that lead to Ms. Doe's identity being revealed, anything he says. And that's now an unfortunate truth because her name is very widely out there.

THE COURT: And if there isn't and there doesn't appear to be a direct line from what he says to their disclosure, then that's not on him. But when there is a direct line between what he says and their further disclosure, that kind of is on him.

I think for right now, I want to go back and look at some of this evidence and look at the videos. We have a lot to get through, so I think I would suggest that we move on to the second issue, and this is the documents. And I have questions, really, for counsel.

It is pretty clear to me but I wasn't obviously handling the discovery side of this, but it appears uncontested that when Judge Garcia was trying to get this

case over the finish line in terms of discovery and she was not inclined to further extend it, as was plaintiff's request, the docket and I think the memorandum don't disagree, it appears to me that all of the parties contemplated that plaintiff's forthcoming sort of final production would be de minimis, able to be reviewed in a weekend, no reason to further extend the discovery deadline, the depositions are all going to take place hopefully in March. And then in late February, there is a production of 70,000 documents, the vast majority of which have been identified as not responsive or irrelevant. And the inference that was drawn and the argument that's being made, and I've not made any decision, is that this was in fact to get the delay that you had wanted. That's the accusation or that's the allegation.

MR. TAUBES: I understand.

THE COURT: And I look at some of this stuff and just -- and your opposition was first we don't give enough, then we give too much. You know, "damned if I do, damned if I don't" kind of approach to discovery. And I understand that argument too. But I do want, Attorney Taubes, a better understanding of what went into the decision to send all these documents over. Who reviewed these documents? Did Mr. Khan review these documents?

MR. TAUBES: No. I did everything. It's all on

me.

THE COURT: Okay. So you obtained from him, presumably in electronic form, access to all of these records?

MR. TAUBES: No. We hired a vendor, which was the same vendor which Yale had used because we wanted to get it done as quickly as possible. The vendor has a forensic intake team that met with Mr. Khan, took his devices, did an extraction of the data from his devices, took his credentials from his social media passwords, user names, took extractions from those social media, did a number of data processing tasks, which cost an extraordinary amount of money, I might add, on short notice, put them into a database which allowed the documents, messages, emails, everything to be searched. We applied search terms that were provided by Yale and the defendants to us to search all of the messages and documents.

THE COURT: Why did -- and I'll let you furnish, but why was there this assessment that there was not going to be enormous production?

MR. TAUBES: I never made that assessment, Your Honor.

THE COURT: Okay.

MR. TAUBES: I was begging everyone for more

time throughout this process. I really, really wanted more time. Throughout. I was meeting with them. And they would tell me we're okay with more time. Then they would come back and say, no, we met with someone else and they said no, we can't agree to more time. I really wanted more time.

THE COURT: So when all of a sudden this database is created by the vendor, what did you do next?

MR. TAUBES: We applied all of their search terms. These search terms were too broad. Some of them I was able to agree to remove, with their agreement. But some I wasn't. And I had to go through everything. Nothing I produced to them did not come up as a hit on their search terms.

THE COURT: But what about time parameters?

MR. TAUBES: Everything was within the parameters they provided to us. I followed their time parameters, their key words. It resulted in an enormous amount of material that I begged for more time to go through, but went through to the best of my ability.

What happened was I erred on the side of saying if I mark something as nonresponsive or irrelevant, then that will lead to a delay potentially because we even provided them with, for each search term this is how many hits there were, this is how many we produced, you know.

So I just erred on the side of providing things to them.

Now, here's the thing. The method that we provided it to them, the export of the documents, again was using the same vendor they used. So when it goes to them, it goes into their database. And once again, they can search through the documents using key words, filtering.

So, for example, they gave you a list of email addresses, because we gave them so many emails, these are the people who sent emails. Some of them are like JetBlue or Uber or something, so the implication is that of course that's nonresponsive. Although at some level, some of those things might be. And I gave some examples in the brief. They really want to know lost opportunities that he had because he's no longer a Yale student. Well, they're saying, oh, some of these events and things are from before. Well, exactly. These are the types of events and opportunities he had when he was a Yale student. He no longer has them when he's not a Yale student. But anyway, they can just say show me what Alex produced minus those email addresses. It takes two seconds. In my view, as I'm producing it, I'm thinking if there's things that are overinclusive that I'm producing, the cost of that to the case is actually very low.

Did I think that it was going to delay the

A-319

depositions?  Frankly, I was expecting at that time very many documents from Yale that I still haven't gotten.  And I didn't think the depositions could go forward without those.  I mean -- and that's part of the reason why I gave them as much as I could because my idea was let's stop fighting about the documents, they can have anything they want from him.  Anything I didn't give them -- we're going to get to things I didn't give them at that time that they think was frivolous, which I don't agree with -- but I put on a log, I didn't hide anything.  I was absolutely not trying to delay this case.  Absolutely not.

THE COURT:  Okay.  I don't know if this is Attorney Weller or Attorney Gooley, if you wish to be heard on this.

MR. GOOLEY:  I think I'll start, Judge, but I think Yale is also going to speak on this one.

ECF 274 is a joint motion for extension of time filed by all parties on February 18, 2025.  All counsel agreed to a request by defendants that their deadline to disclose experts be extended by nine days from February 22 to March 3 in order to ensure that their disclosure deadline remains after plaintiff's deadline to disclose addition documents such that putative experts can review additional documents if need be.

The expectation of all counsel in a joint motion

signed by all counsel as of February 18 was that we were going to need a matter of days to review the impending document production from plaintiff. That's because by that point plaintiff had produced 14,000 or so documents. The expectation was that this was going to be the kind of last drip, whatever else was remaining. And instead, we got 77,000 documents on the eve of all of these deadlines, including not just the expert disclosure but also the depositions that Judge Garcia had worked extremely hard with the parties to schedule the close of discovery generally, which I think was only six to eight weeks out at that point, which Your Honor previously said she was not going to move, obviously over Mr. Khan's request to move it out significantly. So that's the procedural history where we get this massive 77,000-document dump, no warning that it's coming, every indication that it's only going to be a small amount of documents that will easily will be able to go through and get our exhibits.

I know their position is, well, we could have just searched it. Searching 77,000 pages of documents, right, is no small undertaking. Attorney Laurato submitted an affidavit about that. I don't believe we finished going through these documents until May. Obviously when that happens, Judge, you can search for some things, but in order to know what's in there, in

order to make sure our experts have critical documents, in order to make sure our witnesses are prepared for the depositions and aren't going to be surprised by something they didn't have a word search right in the email, we need to go through everything.

And so the idea that this 77,000-page document dump without warning and, you know, the last minute was not going to delay the case, is baseless. It was absolutely going to delay the case. Any time you drop 77,000 documents, it's not going to be a couple of days to go through them no matter how they're produced. I mean, I think it goes without saying. I mean, I heard a conclusory objection to, well, these aren't relevant. I mean, we're talking about advertisements for Walmart's Photo Center, Amazon emails, emails from a concert, the Burning Man music festival in 2014 before these events are even happening. I mean, it's the classic document dump.

Look, it's either delay or it's to conceal what was in there, which I will be the first to admit there was some relevant stuff in there. I think we've -- there's about 15 percent, being overly generous, was relevant. And I should point out, that 15 percent includes a lot of reproduced documents, documents we already had from the prior productions that were relevant to the case. But there was some stuff in there. Certainly, Your Honor now

has I think an email about one of the Sally Roe alleged incidents that I believe was in that production. Obviously, that's highly detrimental to the plaintiff's case. And so the fact that it's buried in 77,000 pages of documents and it's produced on the eve of a very critical juncture in the case, in light of everything that happened in the case to that date, which includes all the history that I won't revisit with Your Honor, obviously raises very serious questions about why we are getting Walmart Photo Center emails at this late juncture.

I don't know that I have much more to say to that. I think Yale has something to say.

MS. WELLER: Thank you, Your Honor.

I think first I just want to correct what I think are honest misstatements. The documents that the plaintiff produced in this document dump there are 72,000 pages, not 72,000 documents. It's about 18,000 documents. So just, to be fair to the plaintiff, I'd like to correct that.

What I'd just like to add is just some more of a timeline to show the work and the effort that the defendants had to put into complying with Judge Garcia's orders to get these depositions scheduled and completed and just to get to her Herculean efforts to get this discovery across the finish line.

A-323

So January 15th of this year Judge Garcia orders that the parties meet and confer to discuss a schedule for deposing witnesses. The parties agree to block March 13th and the week of March 17th and March 24th for depositions. Plaintiff agrees to send the defendants a list of the top ten witnesses he seeks to depose. Judge Garcia on January 23 enters another order identifying the agreed-upon deposition dates of March, March 13, 17, 18, 18, 19, 21, and 24, and that plaintiff will provide the list of top ten witnesses. Attorney Taubes sends a list of 17 proposed deponents. We begin notifying them and working to schedule the deposition dates. By February, dates are being locked in for depositions to correspond with those March deadlines.

We get the document dump of the 72,000 pages on February 27.

At around the same time Attorney Taubes is now starting to tell counsel that he's unavailable for some of these depositions because of a criminal case that has been called to trial.

March 4, we meet with Judge Garcia, the parties, and we raise these concerns that we have regarding the volume of the dump, the substance, and the timing of it. Because of this, the Court then finally modifies the plaintiff's -- gives the plaintiff extra time. And

because we can't go forward with these depositions not having reviewed these 72,000 pages, we on the defense side finally agree to what plaintiff had been asking us all along which was to extend the scheduling order. The Court accepts it and at the same time orders Attorney Taubes to provide a list of the requested depositions by April 11.

We begin going back to the deponents, going back over their schedules, and we again start scheduling their depositions. By end of April, we alert the Court to five tentatively scheduled depositions.

On May 14 we send Attorney Taubes a list of eight confirmed depositions, and we tell him about some of the issues that we have in locating one of the witness/deponents who is no longer in state and may no longer be in the country.

May 16 Attorney Taubes again begins canceling those depositions and in an email says we need to reschedule two of them, Post and Goldberg, and I may also need to mark off another one. After that, we filed this motion to dismiss. And then a month later the Court stays discovery.

When plaintiff put in his opposition to this motion to dismiss that we made a material representation about plaintiff trying to propose depositions that were not even scheduled and he called that statement false,

that is a misleading and untrue statement and is directly contrary to the timeline that I just went through. Depositions were scheduled. Were they noticed? No. I think one notice came out. We kept asking for the notices of depositions, we had them locked in on those dates, and we provided some of those dates to the Court in our joint filings. Every effort was made.

And the problem that we have is that this is a case about facts that occurred in 2015. It irrevocably prejudiced the individual defendants who are witnesses. Their recollection now is not what it was had this case not been delayed. We have one defendant/witness who is over age 80. We have another defendant/witness who is in a memory care facility. We have defendants/witnesses who are no longer employed by Yale in this state and may not even be in this country. This delay has caused prejudice and harm to Yale that cannot be reversed at this late juncture.

And why were we paused? Because we were sent pornography that we had to review. We were sent Walmart ads that we had to review. There was no basis for these materials to be sent in discovery. They have done nothing but delay this case. And the harm and the prejudice to the defense, it's truly -- it's irreversible. And I think nothing short of a dismissal is warranted.

THE COURT:  Thank you.

All right.  I think before I ask Mr. Khan any questions, I would like to hear from counsel on what I view is perhaps the most serious of the issues presented. That's not to make light of these first two issues.

In response to the interrogatories about any other allegations of sexual misconduct that were made as to Mr. Khan, he identified two, Jane Doe and somebody who we are referring to as Peter Roe.  In addition to those, the defense has put forward a complaint that was made in the spring of 2013 that he grabbed her and forced himself on her that resulted in a meeting with Mr. Khan by Yale officials and it resulted in Mr. Khan sending an apologetic email to the claimant.

Then we had a 2014 complaint about an event in 2013, same thing, sort of physical aggression and an effort to disrobe the complainant.  This resulted in a meeting with multiple people from Yale.  And Mr. Khan was involved in that and indicated something to the effect that he must have misread the cues.  And then there were emails in follow-up to that.

There was a December 17 complaint of events that occurred in 2015 from a woman that said he pushed her against a wall, tried to hold her hand, and started asking her personal questions about intimacy and whatnot.

There was an allegation by a woman in March of 2018 that he, uninvited, put his hand under her clothes and then kissed her unexpectedly and suddenly.

There was an aspect to the allegations involving Peter Roe that were completely left out because there was a third complainant who I think is referred to, not pseudonymously but perhaps not by her real name, that he had forcibly engaged with her in a sexual fashion.

I will agree with the defense that somebody being, quote/unquote, "creeped out" is not something that would have triggered a response. But all of these events would have, and arguably should have, been included in response to this interrogatory. And Mr. Khan signed off on his answers under penalty of perjury, and the evidence is pretty compelling that he lied and that he concealed these other allegations.

In response -- and this was very troubling, Attorney Taubes, you -- he's your client. You can just ask him, but you don't. You say, well, maybe he blocked it out and didn't remember. Or maybe he didn't really think that it was responsive. Or maybe he forgot. It is unacceptable that in response to very specific factual allegations supported with documentary evidence I get back speculation from counsel as to why this might have come to pass.

And aside from the speculative nature of the response, it really strains credulity that he doesn't remember any of this, especially when it is so clearly in his interest that this information not come out.

So I will -- and obviously this is going to be part of the subject matter of my questions for Mr. Khan, and again I will repeat that he still enjoys whatever privileges might attach to any of my questions.  But I guess I'll hear from you first, Attorney Taubes.  And this really isn't a legal argument, but I obviously will hear from you.

MR. TAUBES:  Thank you, Your Honor.  And I think that, again, Mr. Khan is here to testify about all of this.

The question asked him to name incidents where he had been accused of sexual assault.  And the actual allegation -- it's not clear to me that the details of every allegation that had ever been made to Mr. Khan was presented to him.

THE COURT:  Did you know about these?

MR. TAUBES:  I actually did not know about these incidents until they produced the documents.

THE COURT:  Which would suggest your client hasn't been entirely forthcoming with you either.

MR. TAUBES:  Not necessarily, Your Honor.  Not

necessarily, Your Honor. Because, you know, I understand that Yale and the defendants have a position that, you know, touching someone's hand, they don't want you to touch their hand, is sexual assault. Maybe under a fair reading of the definition that is provided, it is. But that doesn't mean that an individual answering a long set of interrogatories many years later thinks of a hand-touching incident as a sexual assault.

THE COURT: It was a hand touching with also hand going under the clothing and kissing her unexpectedly.

MR. TAUBES: But he doesn't necessarily know that that's what she said because that's not always how these things go. Someone will come and say there's been a complaint about you, they're not going to say "and she said you did this, this, this, and that." And again, these are not situations that resulted in any kind of arrest. There was some informal talking about them.

THE COURT: So his answer will be I just didn't think these were responsive?

MR. TAUBES: I believe that that's his answer as to some of them. Some of them he actually did not remember. It's going back to his college years, early college years, and a lot of things happened at that time and was going on during that time.

There's also the fact that, you know, like one person was creeped out.  He felt like when his status was -- when he was sort of like outed as this alleged sexual abuser, that many people were telling stories about him, and he doesn't necessarily know all the stories that were told or remember all the stories that were told because as soon as he became a target, he was a target.  And some of this goes back before this incident.  Those things, you know, he -- and we're really going back into college days, Your Honor, but he was a college -- on the college political council and there was a lot of rivalries and competitions and rumors spreading.  He doesn't necessarily know every rumor.

THE COURT:  He was involved with these.  People went to him and told him somebody has made a complaint, and they counseled him and they made him go to a program, and he wrote an apologetic email.  None of it is in his interrogatory response.

MR. TAUBES:  Correct.  Which asks whether he committed sexual assault or was accused of sexual assault, and then there's a bunch of other things that are not defined, you know.  But I don't believe that he was purposefully trying to hide or lie or intentionally deceive the Court.

THE COURT:  Attorney Taubes, are you telling me

that when you got these interrogatories, you didn't sit down with him and say anything, anything at all? Don't answer that. I'm not trying to get into --

MR. TAUBES: And there's good reason why someone might say that as a strategy in discovery and there's other reasons why you might construe it in an ordinary way where you don't necessarily view some of these things as a sexual assault allegation or some of the things he may have forgotten. There's a lot going on involved in his college life.

THE COURT: But the interrogatory wasn't limited to sexual assault.

MR. TAUBES: No, it says -- it says -- it says sexual assault which includes rape, groping, and any other nonconsensual sexual contact. But you can say that, but that doesn't change the fact that you're still saying sexual assault. Then it says sexual harassment, which you and I both know has definitions, pervasive, severe, how we define that. Intimate partner violence, you know, touching of the hand, does he do it as violent?

THE COURT: Wouldn't Sophie qualify for intimate partner violence?

MR. TAUBES: I apologize. I don't know -- I don't believe that he believed that she had complained in that incident about him. I think that he believed that it

was the Peter Roe who made that complaint.

And obviously he wasn't hiding that incident because everybody knew that there were three people involved in that incident. So he believed that the complaint was coming from Peter Roe. He wasn't trying to hide Sophie.

THE COURT: But the complaint involved allegations that he was physically aggressive and abusive in a sexual fashion with that third person.

MR. TAUBES: I believe that he viewed that as an allegation that was made by Peter Roe and that that's why he answered it as Peter Roe. But again, it was no secret that there was a third person there. We produced documents that, you know, related to that. We gave them releases related to all of that.

THE COURT: So is it your argument that he either forgot or misunderstood? Are you making an argument that these events are not responsive to that interrogatory?

MR. TAUBES: With regards to Sophie or with regards to the entire interrogatory response?

THE COURT: Any of them.

MR. TAUBES: Well, I think Mr. Khan is here today to speak about the specific incidents. And the answer that he gave, there's no -- it's a little late to

change it now.  It is what it is, you know.  It was answered at a period of time.  We received these additional documents after, you know, we answered it.  But the answer is what it is.

THE COURT:  Okay.  Attorney Gooley.

MR. GOOLEY:  Thank you, Your Honor.

This is another one that strains credibility, but I'll get to it in a minute.  Before I get there, Your Honor, I want to start a little more abstract.  And that is to describe the importance of this evidence and the prejudice to our client from this evidence.

Mr. Khan initiated this lawsuit against our client saying she falsely accused him a sexual assault.  "Not me," he said, "I would never do that."

Right from the get-go when we started discovery in this case, we started investigating evidence under Rule 415, 415 of the Rules of Evidence which allow us to bring in evidence of other sexual assault.  That has been a key part of our defense from the get-go.  It has been central to our defense strategy, as is evidenced by these interrogatories, as is evidenced by everything because it shows that our client was truthful, it shows that these claims that he's making against our client, they were false, are absolutely fraudulent because he has a pattern and practice of sexually mistreating other women as these

allegations you just went through showed. That's at least what we would intend to show at trial. And that's why we have been focused on this. And that's why this is such a critical issue. It goes to the heart of Jane Doe's defense.

Anyway, with that preface, let me start by saying it's simply incredible to believe that he either misunderstood or he forgot. And let me correct a few things.

First, our interrogatory did not ask just about sexual assault. It asked about sexual misconduct and specifically on ECF 332-5, page 3, we asked about all sexual misconduct. In our instructions, which are at ECF 332-3, we define sexual misconduct not just to include sexual assault which includes rape, groping, and any other nonconsensual sexual contact but also sexual harassment, intimate partner violence, stalking, and any other conduct of a sexual nature that is nonconsensual. That was the definition we used. It's a broad definition. It's also Yale's definition. The Yale definition is at ECF 332-4.

That's important because, as Your Honor noted, he gets called before, literally meets with the chair of the Yale UWC about one of these allegations, he's called in to meet with his dean about another of these allegations, he goes to the training, he has the apology

email all at Yale, all under what it deems sexual misconduct.  That's the definition we used.  And yet he's still saying I really misunderstood or I don't remember, I'm actually not sure which is which.  But, anyway, let me kind of just keep going to the not remember.

It is incredulous to believe that his dean called him, right, about I think that was the Sally Roe 2 and didn't talk to him about the specifics of the allegations, as they would have us believe, but that he had to go and write her an apology email and that he just forgot about that or didn't understand that that was an accusation of sexual misconduct.  It's incredible to believe that with Sally Roe 1 he had to meet with the chair of the UWC, I believe that one was, unless I'm switching these, and the allegation was he kissed her so forcefully that it caused her ear to bleed.  He ends up going to training because of that.  His dean has to hound him to go to the training.  Your Honor's seen those emails.  And he's simply forgotten all about that?  It's incredulous to believe that he then forgot about the *Yale Daily News* article and that there's an allegation specifically from Sophie in there.

And let me read it to you.  In the *Yale Daily News* article, which is at ECF 332-8, it quotes Sophie as saying, "He was hitting me really, really hard — like way

too hard .... He left some pretty unacceptable marks on me, like on my face."

That is absolutely unquestionably an allegation of sexual misconduct in the scope of the definition we asked, and the idea that these were not disclosed to us is incredulous given how contrary it is to his central claim that "I would never do this. I was falsely accused."

But anyway, Judge, let me take a side step for a second. We submitted to you our August 6, 2024, discovery deficiency letter to the plaintiff. We raised a bunch of discovery issues in that letter. One of the issues we raised is we said to the plaintiff, through his counsel, we don't think you fairly answered this interrogatory. We think there are other allegations out there. We even included a link to a video of the plaintiff giving an interview talking about 20 or something allegations, I think there were complaints or something like that, I don't remember what word he used, but we literally excerpted the video, and Your Honor has that video where he's online talking about the number of complaints and allegations. And instead of saying, oh, yeah, you're right, we misunderstood then, they doubled down. And they said no, he was talking about like complaints that are not sexual of nature or what have you. And from August all the way until frankly some of this stuff first arrived in

the 70,000-page document production that we finally got at the end of February, he didn't make any effort to switch the interrogatories and go, oh, now that I understand what you're asking about, sure, there were some others. He doubled down.

So whatever, Your Honor, he's going to tell Your Honor, Your Honor needs to understand that this wasn't just something we ran to the Court and that's the first he's hearing about this. He heard about this issue in August. He had an opportunity to instead of sending us off the track of the discovery process we were on to get us back on the track and say, all right, yeah, you know what, maybe I misunderstood -- which we still wouldn't have accepted, but regardless -- maybe I misunderstood and we're back here now and here's the full list.

As we sit here today, we have absolutely no faith that we have the full list. We don't know what else is out there. We don't know what he's withholding from us. There are certainly indications, and some of it's in the record that Your Honor has before you about things that cause us great concern.

And so let me give you an example. He produced his messages with Peter Roe. We're going to talk about that, I think, later. In there he literally writes to Peter Roe -- and I'm on ECP 373-6 at page 2 -- "not even

**A-338**

norm and Dan" -- meaning Attorney Pattis and Attorney I think it's Dan Erwin, I believe -- "know everything."

Next page. "I mean figuring it out through the pieces that have fell through the cracks over the past few years." He's messaging Peter Roe. I mean, seemingly he's acknowledging that there's other stuff out there, which kind of brings me back full circle to the idea that he forgot about this is incredulous especially because we gave you -- and give me a second to find it and I'll give you the specific citation.

The report that was written by the mental health professional at Yale in 2018, and what happened was -- it's a sealed document so I'll just describe it briefly, but it's Exhibit S to our third motion. And anyway, what happens is the plaintiff meets with a Yale mental health professional. And so do, by the way, Yale's Title IX coordinator and plaintiff's dean. And the plaintiff's dean and the Title IX coordinator talk to the mental health professional about a bunch of allegations of sexual misconduct, including the ones we're focusing on but other ones too. And then the mental health professional asks plaintiff about them. And I'm on page 407 of this document, and the mental health professional is literally recounting his conversation with the plaintiff about these allegations and what the plaintiff said. And it's clear

from his responses he remembered them.

And here's where it gets really outrageous, Judge.  This document was turned over by Yale in discovery to the plaintiff in 2020 in this case.  So he's sitting on this document.  Clearly one would think that would refresh his recollection that all these allegations happened when he's reading a report summarizing them and summarizing the interview he had with the mental health professional about him.  But yet we still don't get anything except our own client's name and Peter Roe's name in the interrogatory responses.

Again, I mean, I think I've been long-winded and I apologize for that on this one.  It cannot be overemphasized that this is critical evidence that is just incredulous to believe was misunderstood.  It was highly prejudicial, the failure to disclose this evidence.  And what else may be out there?  Which we don't know.

I think that's it.  Sorry for being a bit long-winded, Your Honor.

THE COURT:  Thank you.

Does Yale wish to be heard?

MR. NOONAN:  Thank you, Your Honor.

It strikes me that the notion that he forgot these things is complete nonsense.  But if you could possibly believe it, it would show that the prejudice to

Yale in proceeding with this case, given the delays, is really extraordinary because, yes, after many years people can forget, especially those of us, including myself, who are senior citizens.

THE COURT: Thank you.

The last issue I want to hear from counsel before I ask Mr. Khan questions is this dispute about the privilege log. I have looked at the Peter Roe text messages and they are -- it is self-evident why the plaintiff would not want to turn them over. They're horrible. It is a small fraction of them, however, that at least arguably implicate this notion that Peter Roe was a voluntary paralegal that would bring him within the ambit of an attorney-client privilege.

Mr. Khan has argued that he is permitted to test the boundaries, obviously in good faith, of an attorney-client privilege, and that ultimately he withdrew the claim of privilege and the communications with Peter Roe were turned over. I would suggest that that is Attorney Taubes's sound legal judgment carrying the day. But one of the difficult issues here is that even if some of the discussions -- and there are discussions Peter Roe saying you can't call me a paralegal, and Mr. Khan saying, well, don't tie it to the financials. They go back and forth how to characterize Peter Roe, which feels very

deliberate. But that is a small fraction of the communications. And the majority of these communications, even if a privilege is to be asserted, especially an attorney-client privilege, it's not just the label of the person with whom that communication is occurring. It is the communication has to be for the purpose of seeking legal advice.

And respectfully, Attorney Taubes, there is no way to characterize the vast majority of those communications as falling within the ambit of even an arguable attorney-client privilege.

And I look at the log and I try to match it up to the communication at issue, and there's a real disconnect there. And so I guess -- and so the inference to be drawn is that Mr. Khan doesn't want the defendants to see these communications and, as I said, for very good reason. But when -- and leaving aside the arguably privileged communications, when there really is no basis to cloak most of these communications under any privilege, the inference is that it's to obstruct the discovery. And if it were the only thing we were talking about, maybe I figure out what to do about it. But it's not the only thing we're talking about. I wish it were. But it's not. It's just another in a long series of efforts by Mr. Khan to thwart unfavorable information. And when I consider

the other accusations against him over the course that were not disclosed and I consider that in conjunction with, I'm sorry, it is a wholly frivolous assertion of privilege -- and again, we're talking about some of the communications, not all of them -- the inferences keep stacking up against Mr. Khan.

So, Attorney Taubes, I'll hear from you first.

MR. TAUBES:  Thank you, Your Honor.

And I just want to start by saying that there's blame here that really belongs to me more so than Mr. Khan.  And I want to provide the Court with some of the rationale for what happened.

As Your Honor noted, there are certain communications that do have some of the legal character to them.  And it's also the case that they had this relationship which Mr. Khan believed was that of a paralegal, especially during the time period of --

THE COURT:  And I take it that he's going to testify to that effect?

MR. TAUBES:  I believe that he will, that he believed that he was a paralegal during a lot of that time period.

THE COURT:  He says right in there you can't call me a paralegal.

MR. TAUBES:  Yeah, and you have to keep in mind,

Your Honor, that these are young people who don't yet even have a college education, they don't really know what they're talking about that well. They're trying to act like they do and that they're masters of the universe and they understand everything, but they really don't. But what Mr. Khan doesn't have, he doesn't have that knowledge, but he does believe at the time that he has this confidential legal relationship with this individual.

THE COURT: And that confidential legal relationship is going to cover the conversations about setting up a sexually liaison with somebody?

MR. TAUBES: Well, there are two things that I was -- two things I was concerned about. One thing I was concerned about was that if I produce some of the communications but not all of them, that I would be waiving the claims as to the other ones. And there's also -- and I did state to counsel, you know, in our meet-and-confer that there were certain documents that were not -- that were more of a personal nature. But it's also kind of -- one of the issues was this, which was that a lot of those documents that ultimately were produced don't really have anything to do with anything in relation to the case. I mean, they only really are responsive because they are between Mr. Khan and Peter Roe. So, you know, some of them are just nonresponsive. I could have

just not even logged them because they're not responsive to any discovery.  Instead, what I did was I took all of the communications between them and I put them on a log.  And I wasn't trying to hide that some of them were more legal in nature than others.  Ultimately, I decided that because so many of them were non-legal in nature, we couldn't maintain a privilege claim at all and we disclosed everything.

THE COURT:  Nor could you sustain as a factual matter that Peter Roe was a paralegal working on behalf of an attorney.

MR. TAUBES:  There was certain times when he did work on behalf of the attorney to help Mr. Khan.

THE COURT:  Well, he was working on behalf of Mr. Khan who happened to have an attorney.

(Plaintiff's counsel confers with client.)

MR. TAUBES:  So his understanding was that he had a contract with Margaret Valois, who was one of his attorneys at the time, and that she had a contract with Peter Roe.  That was his understanding.  But -- and obviously we did withhold the documents for a period of time, but to the extent that the Court believes the position was frivolous, that's on me.  It was not Mr. Khan telling me to make a frivolous privilege claim nor would I do that under instruction of my client.

THE COURT: Don't you think it's a reasonable inference to be drawn from those messages that Mr. Khan himself is trying to set up a relationship with Peter Roe that will shield their communications from further discovery down the road?

MR. TAUBES: I think that it's normal for a person who is in a position like Mr. Khan was in at that time to want a confidante whose communications you have with them are not to be shared with another person. Remember, he's an immigrant in this country. He doesn't have his parents to go home to. He doesn't have a brother or sister. He has this person who, frankly, if you read through the entirety of the messages, I believe this individual was kind of manipulating Mr. Khan at times and taking advantage of him and taking advantage of the notoriety of Mr. Khan's case, and I think there are many times where Mr. Khan steers this Peter Roe away from some of his darker and worse things because it was a relationship that ultimately did not benefit Mr. Khan at all. And ultimately probably is directly, you know, related to the ultimate outcome in the case and things that happened ultimately because they were definitely taken into consideration by the defendants.

But when -- I believe that because the relationship occurred also during the pendency of

litigation that he was involved in, that it was impossible for me to produce some of them and then claim privilege on the others.  Instead, I put all of them on a log and claimed.  Ultimately, I made the decision, which Your Honor agrees with, to waive that claim.  But at all times I believed that we had a colorable claim to withhold those documents until we did not withhold them anymore.

THE COURT:  Attorney Gooley.

MR. GOOLEY:  Thank you, Your Honor.

At the risk of repeating myself, this is critical, critical evidence.  It goes not just to the Rule 415 issue I was talking about but, remember, right in plaintiff's own complaint there's allegations about Peter Roe's allegation and Yale's handling about that.  Yale suspended him as a result of the allegations Peter Roe made which stem from this incident that was being planned in these messages.  So the idea that these are just like some abstract out-there thing is -- it's just not the case.  They are absolutely critical to both Jane and Yale. It was highly prejudicial to withhold them.

A couple other just kind of factual points for Your Honor.  In terms of withholding some but not all, this was the at least second batch of Peter Roe productions that we received.  We received an earlier batch of Peter Roe productions.  This is the stuff that

was held as purportedly privileged. So in terms of the concern about waiving privilege if I produce some but not all, we got a whole lot of doc -- not a whole lot, we got some Peter Roe materials earlier.

THE COURT: Were they communications?

MR. GOOLEY: Yes. And communications, thank you.

In terms of the actual claim itself, I think there's two issues. First, there's the paralegal claim, right, that anything could be shielded with Peter Roe. And then there's the claim about could this stuff be shielded. And I'll try to address them in this order.

Attorney Pattis -- and this is in the record but, forgive me, I'm not actually sure where it is. Attorney Pattis said never my paralegal, never part of the defense of the criminal trial. At all. And, by the way, the criminal trial is over by the time we're talking about in these time frames right here. It's early 2018, if I have that correctly. So the trial is early 2018, it ends. These messages are a little bit after that. I think it's March or April, if I'm not mistake. Oh, excuse me, May. There's nothing going on at this time.

Right in Mr. Khan's complaint there's an allegation that Yale took no steps to restart the UWC process at that time. They restarted it later, according

to him. But yet we have all of these privilege claims about Mr. Roe purportedly being a paralegal when the criminal trial is over and, according to the plaintiff, the UWC has not started back up and running yet. But regardless, I think the bigger issue is not whether Mr. Roe could be claimed to be a paralegal at all, it's how could these communications possibly be privileged. They're just not. They are not under any shape of the privilege.

I mentioned that we received other Peter Roe records. We also received the plaintiff's -- and this was another basis for our motion -- the plaintiff's recordings of the UWC proceedings. They had no problem -- even though it took them a while, they had no problem producing to us redacted versions of those transcripts. They blacked out what Attorney Pattis told the plaintiff during the UWC proceedings and produced the rest of the stuff on the basis that it was relevant and not privileged. That could have even more easily been done here. I don't think there's anything in here, but even assuming that there's some slight two messages in a 29-page message string that are privileged, easily could have and should have been produced and redacted, and the balance of this should have been produced long before it was. It comes back to the same themes and patterns we've unfortunately been

discussing not just today but also obviously this is our third motion. But it's obviously unhelpful. He doesn't want it produced. He stalls producing it. We ultimately, after multiple meetings, both defendants file motions to compel, and then we get it before the day before the objection to the motion to compel is done. You know, it fits perfectly with this very unfortunate theme that we've been discussing. But that's, I think, the highlights of this issue.

MS. WELLER: I just want to add one thing to this, and I'm sorry for all this frenetic movement here. I know I have something.

Attorney Taubes said that he withheld the Peter Roe communications because he didn't want to open the door and waive the privilege. But I know without a doubt that we received text messages between the plaintiff and Peter Roe in the first batch of production that Attorney Taubes gave us. I know because I got them, they were wildly out of order, you know, a communication June 1st, then it went to like March. The dates were out of order. And I sat down during the Democratic National Convention and laid all the papers on my floor and I put them in order. And that became a joke during one of the meet-and-confers that I took this time to put them in order, and Attorney Taubes asked me if I could -- that's how he received them and

would I do him the courtesy of sending him the reordered batch of text messages, which I agreed to and I sent to him. So I know that they sent us Peter Roe communications before they withheld Peter Roe communications under this privilege.

MR. TAUBES: If I may, Your Honor?

THE COURT: Yes.

MR. TAUBES: Certain documents that I did produce to them were documents that had already been shown to another person. There had already been a waiver of the privilege over the ones that I did produce.

The documents that I held as privileged were documents that we obtained because we got all of his devices, all of his social media, we gave it to their vendor, we applied their search terms. And these were the documents that came up. And they were new documents that I believed there was a claim to be made about them. Ultimately, I withdrew that claim which I think is probably the right decision, but the -- at no time did we ever try to hide anything. Never. Like I said, there were other things that we did produce. Everything that we didn't produce we put on a log. If I had the time to go through and redact, I would have done more work. There were times I will freely admit that in trying to get this case ready as quickly as I can, I have not had enough

hours. I have not had enough time to do it all. There's been too much.

We've produced a lot of documents. And it was through effort to get the evidence that they're seeking to prepare their case, much of which they're now using to say the case should be dismissed, but they wouldn't have had if we hadn't gone through a lot of effort and cost and expense to get them this evidence.

In the meantime, we've been seeking discovery that we rightfully think belongs to us. We've made claims that privilege claims that they've made are not warranted. None of that has been resolved. We've been the party to try to resolve things and give things up, disclose them so that the case can move forward. And I've made mistakes, and I probably will make mistakes in the future, but it was never intentional withholding or frivolity involved in any of it. It was attempting to stay organized and to keep the case moving forward in as orderly and quick way as possible.

Since I took on this case, I've hired another attorney because I recognize that I have many cases and I have to keep up with the caseload and keep up with the orders and keep up with the deadlines. I'm trying to address that issue. I'm not just saying, oh, single attorney and just give me forgiveness. There was times

when there was a lot more to be done than could be done. I did the very best I could. And I'm trying to take efforts so that that kind of thing doesn't happen. But it's not as though -- in terms of discovery, we've really given them everything we have. And we really feel like we've gotten nothing. You know, there are documents that we've been promised that just haven't come, things that were redacted that haven't been unredacted.

THE COURT: But that's -- I suppose that's an issue for another day if I lift the stay, but I'm not sure that that necessarily is a counterbalance to the claims that are made here.

MR. TAUBES: Well, a lot of claims have been made about the prejudice of delay. And I think it's been a little bit one-sided in terms of the causes of the delay because I have worked very diligently to provide them with everything I can and also seek everything that I need. They have everything that I've given. And I have nothing that I've sought. So I don't really think that we're the cause of delay in this case or prejudice because we've been trying to move this case forward and get it to the merits.

MR. SCONZO: Judge, can I be heard on one thing that's related, and I don't know if you're going to get there, but before you question Mr. Khan?

THE COURT: Sure.

MR. SCONZO: And you'll remember this, Your Honor. Going back to the beginning of this case, it started with our motion to dismiss on quasi-judicial immunity, which took us on a great detour through the Second Circuit to the Connecticut Supreme Court and back to this Court. In all of that detour, one of the central issues asked of Mr. Gooley and me was: Was there a record of the UWC proceeding? And I was asked that pointedly at the Second Circuit. I was asked that pointedly at the Connecticut Supreme Court. At those points in time I thought the answer was no, because my understanding was Yale did not record the proceedings. So I answered to the Second Circuit question no, there's no record of that proceeding. I answered directly no at the Connecticut Supreme Court. All the while, I had no idea that Mr. Khan secretly recorded the proceeding, that there indeed was a record of the proceeding. Had I known there was a record of the proceeding, I don't know where this would have turned out, whether it would have turned out differently. I don't know that Mr. Pattis even knew that there was a secret recording. I mention it only because it shows from the inception of this case Mr. Khan was designing deception to throw us off the trail at every step of the way to the great detriment of my client. And that's a

blaring example of where this all started.

MR. TAUBES: If I may, Your Honor, in response to that?

THE COURT: Yes.

MR. TAUBES: When I entered this case, I became aware of the recording and immediately upon becoming aware of the recording recognized that it had certain privileged matters within it.

THE COURT: But you entered the case a little late, don't you think? Can I assume that Mr. Pattis did not know that his client was recording the hearing when he stated that he wasn't recording the hearing? Can I assume that Mr. Pattis did not know that his privileged communications with his client were being recorded? And can I -- withdrawn. I won't take that last step.

MR. TAUBES: I can't speak for what Attorney Pattis knew or didn't know, Your Honor. But I can say this. At that time Mr. -- the time of that UWC proceeding, Mr. Khan was in probably the scariest and most difficult moment of his life. He feared for his life. He feared he was going to be sent back to Afghanistan. He feared that he might die there. And he was told that there'd be no recording. He was worrying that there'd be people saying that he said things that he didn't say, and that to protect his life he needed to have a recording of

what he said so that someone couldn't say that he said something he didn't say.

THE COURT: So why didn't he tell his lawyer?

MR. TAUBES: You know, I don't know if he told his lawyer or not.

(Plaintiff's counsel confers with client.)

MR. TAUBES: Attorney Pattis was aware that it was being recorded. But --

THE COURT: I think I need to ask Attorney Pattis that. Because I'm not sure Attorney Pattis would allow his client to lie to Yale if he knew that his client was in fact recording.

MR. TAUBES: I'm not going to speak for him. It was a long time before I ever got involved. And you can certainly question Mr. Khan about it, but --

THE COURT: I think I may need to ask Mr. Pattis about it.

MR. TAUBES: But ultimately the fact that he made that recording does not mean that there was a record of the proceeding. There was a recording of the proceeding by Mr. Khan which, you know, might be evidence in this case, but it's not a record of the proceeding taken by Yale.

And when I learned of the recording, I disclosed it to opposing counsel. And then I worked with opposing

counsel to have it turned into a transcript so that it could be properly redacted, and we reached an agreement on how that should be handled.  And I think that that's the way that things should work.

THE COURT:  Well, that's the way things should work by a lawyer.  But you have a client who held onto it for years.

MR. TAUBES:  I don't think that Mr. Khan knew during any of the time that the case was on appeal or on stay that that would be a good time for him to put forward this recording.  And I don't know what advice he was receiving at that time.  What I know is that I came in pretty much as discovery was reopened and was trying to get done with.  I identified this issue and I resolved it. I don't believe that -- did Mr. Khan lie to the UWC when he said there's no recording?  Yes, he did.  And I think he freely admits that.  That's clear.  But when you keep in mind that --

THE COURT:  Although that could also be the inference being that that's why he didn't turn it over, because it made very clear that the first thing he did in that hearing was lie.

MR. TAUBES:  To be sure.  But that does not mean that -- and perhaps because he's lied a jury could decide that everything he says is a lie and is not worthy of

credence. But as a matter of fact and in justice and equity, the Court can recognize that that young man who was very scared and doing something that he thought would protect him and lying in that one instance does not necessarily mean that all of his claims are lies or that everything he says is a lie. And he's now disclosed it, whereas he could have continued to lie. He could have kept it from me and it never would have been found or disclosed. But he did disclose it, which is an act of forthrightness and honesty. And he's here today to testify about the decisions that he made. And ultimately it's just another fact that's going to have to be taken into consideration in this case that there was no official record but, unbeknownst to those involved, he did record it.

MS. WELLER: Your Honor, may I be heard briefly on this? I will be very brief.

Yale served Mr. Khan with requests for production back in 2020 that asked for, among other things, a copy of any audio or videotape recording in plaintiff's custody or control, which captures sort of anything relevant. That was 2020. Obviously the case then went on to a detour. This was not responded to. Yale then re-served the same exact identical interrogatories and requests for production on plaintiff

in 2024.  Now Mr. Taubes is involved.  And in May of 2024 in response to that production request, he wrote simply "See enclosed production."  That was it.  Didn't say what it was.  Didn't point to any page, any Bates stamp.  It then took months to find out what that enclosed production was, to find out that it was a recording of the UWC.  And from the time that plaintiff's counsel responded in May of 2024 "See enclosed production," it took nine months before we then got the transcript that we helped pay for in order to get it transcribed.  And so this was just more delay and obfuscation.

And the same thing with the Peter Roe.  That pornography, those wholly relevant communications were hidden behind descriptions that were innocuous sounding, you know, "FACE discussions," "post-trial logistics."  It truly calls into question all the other descriptions on that privilege log.  Thank you.

MR. TAUBES:  Just to respond to a few things, the transcript took a long time partly because we had to get it transcribed.  That took a couple months.

THE COURT:  When you disclosed it did you say to them, and by the way, there's a recording of the UWC proceeding in here?

MR. TAUBES:  I ultimately did.  I gave them a log.

THE COURT: What does "ultimately" mean, Mr. Taubes?

MR. TAUBES: I think that I might not have given it when I first responded. But then it was like in an update, I provided them with a privilege log that identified it because it wasn't produced.

THE COURT: Oh, because of the conversations with Mr. Pattis?

MR. TAUBES: Yeah. But it was put on a privilege log. I don't remember the exact date of the privilege log. There might have been a little bit of a delay from initial response. I came into the case, I provided them a lot of information, and there was some of it that was rolling because there was a lot of information. But there was never an intentional hiding of it. As soon as we got it, we put it on a log. And then we started going through the process of trying to get it transcribed. Once it was transcribed, I had to redact it.

THE COURT: But the request was for any audio recordings. And the response was, "See attached." Did you at any time send an email or pick up the phone and call and say, by the way, here we are four years into this case, there is actually a recording of the UWC proceeding?

MR. TAUBES: Yes. Yes. That was in our privilege log. The only thing on it at that time was the

UWC recording. So I didn't, like, bury it at all. I did point it out to them.

THE COURT: When?

MR. TAUBES: I can look at that date, but it wasn't months later I don't think.

(Pause.)

THE COURT: I'll let you look for that. I'm going to give court staff a break. We will reconvene at noon.

(Whereupon, a recess followed.)

THE COURT: I just have a few more questions for counsel before I ask Mr. Khan to testify.

Attorney Taubes, in one of the arguments that was advanced was that as part of Mr. Khan's deceitful practices, he had misrepresented to Judge Garcia that he had immigration counsel and that his immigration counsel had advised him as to the question of the trial transcript from the criminal proceedings, and Judge Garcia directed that at the next hearing when she was taking up the issues of the transcript that immigration counsel be present.

Mr. Khan brought Attorney Formica who disclosed that in fact he had not been Mr. Khan's counsel for a couple years at that point. He described himself as feeling like he was sort of in the middle. You have taken that language to suggest that maybe he was in the middle

of Mr. Khan and some other person in his office who was in fact counseling Mr. Khan. It would seem to me that the hearing before Judge Garcia would have been the time to point that out. I read his comment as feeling like he was being put in the middle between the plaintiff and the Court. And the suggestion was that he was getting counsel off and on from Ms. Charnin or Attorney Charnin, so in fact he hadn't misrepresented anything to the Court even though I think Judge Garcia has already found that he did.

And of course this suggestion is really spun of whole cloth unless there's suggestion that that's actually what happened. There's certainly nothing in this record to suggest that that's actually what happened. I take it that was something -- well, let me ask you this. Have you spoken to Attorney Charnin?

MR. TAUBES: No, I have not.

THE COURT: And from whence do you get this argument that maybe she was counseling him?

MR. TAUBES: That was from my client.

THE COURT: So Attorney Charnin is not here to say what your client said is true.

MR. TAUBES: No.

THE COURT: And there was also -- I don't know if this was in a footnote or above the line, there was a suggestion that even though your client had signed

authorizations for one of his treatment providers to provide records, that when that authorization for release of records was submitted to that treatment provider, the treatment provider said no, Mr. Khan called and he said the only thing I'm authorized to give is a summary of treatment. Did that happen?

(Plaintiff's counsel confers with client.)

MR. TAUBES: So that individual -- he said that, but Mr. Khan did not tell him that. And I've spoken to that doctor. And he's told me on the phone "I don't like giving records." Not something I really have ever heard before. But I've personally spoken to him and said you need to provide all the records. And I believe that after we talked to him, he did. But that came from the doctor. He doesn't like to cooperate with court things. That was not from Mr. Khan.

THE COURT: So if I ask your client if he did that, he will say no?

MR. TAUBES: Correct.

THE COURT: Okay. As long as he knows that's what I'm going to ask him. Okay.

MR. TAUBES: And to answer the question you had for me prior to the break, we produced our initial discovery responses on May 20. After that, counsel met and conferred in June. And the issue of recordings was

raised during the meet-and-confer, and we agreed upon a response deadline of July 1st. And I disclosed the privilege log on July 1st with the recordings.

THE COURT: And the initial response to the production was when?

MR. TAUBES: May 20th.

THE COURT: Okay.

Attorney Weller, do you agree with that timeline?

MS. WELLER: That seems right, Your Honor.

THE COURT: Thank you.

Mr. Khan, will you please take the witness stand.

THE CLERK: Raise your right hand.

SAIFULLA KHAN,

having been first duly sworn,

was examined and testified as follows:

THE CLERK: Please state your name.

THE WITNESS: Saifullah Khan.

THE COURT: Have a seat, sir.

EXAMINATION

BY THE COURT:

Q. I do not have a ton of questions. I guess I'll start

with the easy ones.  Who is Dr. Favorite?

A.    She is -- if I recall correctly, about 2018 or 2017 she was a guest speaker at one of the conferences that I was attending.  And I happened to be at the table where we had lunch and where we had a conversation.

Q.    And she's a psychologist?

A.    I don't fully know, but I presume so because she was speaking as that.  I did not treat with her.

Q.    So other than that one encounter with her, you never had any treatment with her?

A.    Zero.  No other encounter whatsoever.

Q.    Did you -- we were just talking about whether or not you took steps to counter a release authorization.  Did you ever contact any of your treating physicians and sort of revoke your authorization and direct them to provide only a treatment summary as opposed to the records themselves?

A.    I have not reached out in that sense to revoke at all.  I have reached out to them saying like, hey, these are records that are being requested, please provide it to them.  And I don't know how an attorney and a therapist are supposed to coordinate or what exactly constitutes a record, is it simply the notes taken -- I haven't even seen it myself yet.  I believe after Yale received some of it, I saw it.  So I did not ever authorize to revoke it.

All I have done is I received I think like tax, therapist, from Loren Soeiro, even Dr. Sara Favorite and many others. I immediately signed them and released them.

Q.    Okay.  Why did your interrogatory responses fail to identify the prior allegations from 2013, 2014, 2015, and 2018 in which Yale personnel became involved, met with you, and in one fashion or another addressed the allegations of sexual misconduct?

A.    Because I believed that it did not answer the question the way I understood it.  The way I read that question was, is what are all the allegations.  Like what is information, which charges have ever been brought against you.  And I only know of two.  One is the Superior Court of Connecticut, New Haven one.  And the Metropolitan Police Department in Washington, D.C.  And those were the two that I assumed to answer the question.  The others I have not been hiding them, I've not been shy about them. I think I pointed it out in the complaint, I've pointed it out in media interviews in general.  But --

Q.    So you read the interrogatory to be talking about criminal charges?

A.    That's how I understood it to be actual -- because there's --

Q.    Did you ask your lawyer what would be covered by that?

**A-366**

A.    I believe I discussed it.  Because there's requests for admissions and there's interrogatories and requests for productions.  And so I did not want to populate a thousand different things because there's all sorts of rumors.  There's comments on YouTube, elsewhere that say, oh, Mr. Khan --

Q.    The interrogatory clearly does not reach comments on social media, but I think the interrogatory clearly reaches allegations that were brought to Yale that you acted inappropriately in a sexual fashion.  And you just didn't include those?

A.    So I did not consider the Yale UWC -- and that's, I guess, my perspective, my understanding, my good faith understanding of the truth to be --

Q.    Did you ask your lawyer whether all of these events might be responsive to the interrogatory?

A.    I don't recall, to be honest.

Q.    You know what?  I'm going to withdraw the question.

A.    It's attorney --

Q.    I don't need to get into your discussions with your lawyer.

      And is it your testimony that you told Attorney Pattis that you were recording the UWC proceedings?

A.    He was there as I was recording.  He witnessed the phone.  At that point I had a Google Pixel phone that I

used to record, it was sitting on the table. He was observing it. He was there. In fact, when Your Honor dismissed the two claims against Jane Doe January 2021 that paused discovery or some sort of situation where Yale and Norm said we can't -- because I was imploring Norm to at least do document discovery while we are going through the appellate procedure, and he said Yale declines. But I had informed both Norm Pattis again there, just as a reminder, and to Cameron Atkinson who largely took over I guess the brief writing and the oral argument and so on that Attorney Sconzo referred to at court. So they had been on notice, they had been aware.

And I don't believe it popped up immediately when -- I forget the vendor's name, when they took my iPhone. So I had to actually personally go and retrieve it from a particular app that I had recorded it in. And like said, oh, wait, this is also discoverable. And so I went and provided it to Mr. Taubes.

Q. Whose idea was it to make Peter Roe a paralegal?

A. It was a weird combination of Margaret -- sorry, Attorney Valois who was in Virginia. I was staying in Virginia at the time in my uncle's basement and so -- but I couldn't take her, the costs were too high to bring her to a Yale hearing. She was there when doctor -- not doctor -- investigator, the UWC investigator came down to

Virginia.  There Margaret Valois was involved in the UWC process.  And so Peter Roe -- I'm sorry, I guess the protective orders apply here.  Peter Roe was the paralegal/contact point between Margaret Valois, me, Attorney Kimberly Lau, Attorney Justin Dillon, two other attorneys, they're in the email thread.

Q.  Calling him a paralegal doesn't make him a paralegal. Whose idea was it to call him a paralegal?

A.  It was my idea.  I had good faith belief that this was a person working for Margaret Valois, signed a contract.  And it was my -- more than the coordination with the attorney, he was actually a big focal point with FACE, the organization itself.  He was a board member there, I forget the exact position.  And so I found, I guess, a form of community also, but the paralegal perspective was mine and Margaret Valois' and his.

Q.  And was it designed to protect your communications from further disclosure?

A.  That is not true.

Q.  The question --

A.  I did not design it for that perspective at all.  In fact, I provided all the discovery.  In fact, some of the discovery that is alluded to as irrelevant or nonresponsive I think it's because the Peter Roe name hits all the conversations because it connects with every

single message.

Q. What documentation did you give the blogger?

A. Which blogger?

Q. The blogger that did the interview with you that was released and that you reposted four times on your social media accounts.

A. Okay. Before I answer these questions, Your Honor, if I say certain names like the blogger's name or the YouTube video, would that be in violation of the Court order?

Q. Since we both know we're talking about the same blogger, we'll just call him the blogger.

A. Okay. So the question is what documentation I provided? I provided him documents that -- like the storage.courtlistener.com which stores Khan v. Yale documentation. And I believe court documents from the Superior Court for my Saifullah Khan v. Jewish Women International, et al. law suit. And so there's a plethora of documents related to public court documents. I was asked for arrest records. I refused --

Q. I don't need an explanation. I just need a list. Did you give him only publicly available court records?

A. I also gave him pictures of my childhood, pictures that my mother curated of various personal stuff. So that was not public stuff. I allowed him to friend me on

Facebook to then go through my profile to identify any pictures or content that he deems appropriate to display. I did not provide anything related to Jane Doe.

Q. And your Facebook, did it include the video that was alluded to as a video of you and Jane Doe on the night in question?

A. I have seen that video, both the blogger's video and the Jane Doe video. I could not find the video of the night in question on that video -- on what the blogger ultimately uploaded. I do not believe it's in there. It's a whole different -- which I don't want to tell the public how to go get it. But other YouTubers and other bloggers from Twitter --

Q. The question was: Is the video accessible through your Facebook page?

A. No. I have not posted on Facebook since 2015 apart from one profile picture.

Q. What is Operation Dragonfire?

A. So to get my head around different stages, I give it weird code names. And I try to, I guess, before -- before I was to be -- before I was, I guess, expelled, when I was going to graduate, I was leading a Department of Defense strategic communications company where we would give different code names to different ideas. And so it's just the next stage of motion practice.

Q.    Motion practice or disclosing Jane Doe's identity?

A.    Motion practice.

Q.    And when you reposted the blogger video in which you express your frustration about the fact that your name is obviously out there and Jane's name remains subject to a pseudonymity order, and when you did that on the heels of me finding that your social media posts were in fact designed to get your followers to identify her, it seems pretty obvious that when presented with similar, in fact in some respects more obvious social media posts, I would reach the same conclusion that you are indirectly disclosing her by manipulating your followers to do exactly that as you have done in the past.  And so it's a very simple question:  Was that your intent?

A.    No.  And would Your Honor like deeper explan --

Q.    No, you have a lawyer to make the arguments for you.

Sorry, I'm just checking my notes.

Circling back to these other allegations of sexual misconduct, it is not your testimony that you forgot about them, it's that you didn't think they were responsive?

A.    To be fair, there are certain portions, the particulars of how things went down, I have forgotten some elements of those things.  But the general gist, it took a bit of recalling because I harkened back to those memories once Yale provided me certain discovery, and I put

together like behind the fake names that they used for each, oh, this is what that is talking about. Apart from that memory aspect, no, I do remember the particulars of those, I just never ascribed to them beyond rumors or very low-level informal proceedings even within UWC because there had been no formal charge by UWC at all until the Jane Doe 2015 allegation.

Q. So when you were imposing this requirement that it either be a criminal charge or a formal charge with the UWC, you did that on your own?

A. There's -- essentially that's how I read it. I don't recall if I asked my attorney the precise explanation. The -- my understanding of interrogatories is much more similar to this as it's an interrogatory with a brief question with a brief answer, and a request for admissions are similar, request for productions are different. So I guess a clumsy approach of trying to understand what is formal because I believe then I would be accused in the alternative had I listed a thousand-plus YouTube comments and Twitter and read it where I'm being, you know, falsely accused of all sorts of random things. And I have been forthright about it in the complaint, in the media, and everywhere, but there have been dozens of people saying all sorts of stuff.

THE COURT: All right. Attorney Taubes,

Mr. Khan has not been deposed yet, right?

MR. TAUBES: Correct.

THE COURT: I think for purposes of this motion, I don't have any additional questions for Mr. Khan. I do have a few questions for counsel, and I'm going to give them the opportunity to argue based on the record.

You can step down, Mr. Khan.

Obviously, there's been a lot of briefing on these issues, a lot of evidence submitted that I will go back and look at, but I'm going to give both counsel the opportunity to briefly -- I have a 1:00 proceeding -- to summarize why at this juncture on this more developed record I should or should not grant the relief requested.

And starting with Jane Doe.

MR. GOOLEY: Thank you, Your Honor.

I'll try to be brief, but to summarize, I'd like to start with some words you said at the July 2024 hearing when we were here. You said, "Here we are again." Here we are again over a year later still litigating plaintiff's misconduct in this case despite not only repeated warnings, a lesser sanction that failed to compel compliance with the order of the Court that seems to only have encouraged plaintiff because five days later he went out and did the exact same thing Your Honor found. Everything Your Honor said at that July 2024 hearing, that

the amount of time that has been spent litigating Mr. Khan's misconduct is outrageous. Everything Your Honor said in Your Honor's memorandum of decision that his conduct is egregious is now infinitely truer today because despite extensive warnings, extensive discussion, admonishments, both verbal and written from the Court, a lesser sanction, here we are again. And that, ultimately, is why dismissal is warranted.

This is a pattern of misconduct that has taken a number of forms that has infected every aspect of this case, that has derailed this case, and it has come despite every effort by the Court to compel compliance with the Court's orders by lesser means and to keep this case on track.

You don't have to take my word for it, though. If you go back and you look at our first motion to dismiss, Attorney Pattis, who was then representing Mr. Khan, filed an objection to that motion. That objection is very telling because you remember the first motion we filed was largely about the disclosure of Jane's name. Attorney Pattis said, Judge, you can't dismiss the case for this; plaintiff's not been warned of dismissal. Dismissal is reserved for things like discovery violations, and a warning, stern verbal warning is more than sufficient to put us on the right track and end this.

That was early 2024. Plaintiff has been warned a number of times. Plaintiff has been sanctioned. He has not complied. We're here yet again now on our third strike. And it's just beyond measure. It goes, frankly, beyond this case, Judge.

If on this record the Court does not dismiss this case, we have a problem that goes beyond this case because the message it sends to other litigants about adhering to courts' orders is not one that anyone who is an upstanding member of the bar wants to send, right? It sends the message that you can get away with, to use Your Honor's words, "egregious misconduct" and ultimately your case won't be dismissed.

And then also, Judge, Your Honor commented on it, but it bears repeating that this objection to our motion, the pending motion right now, the objection we received, in essence, was I've never done anything wrong and I've still never done anything wrong. That came despite Your Honor's memorandum of decision saying you engaged in misconduct, I'm going to hit you with a lesser sanction and a clear warning don't do it again. There's literally a -- I don't know how many pages it is, but a more-than-ten-page memorandum of decision from Your Honor finding misconduct.

We file a third motion to dismiss, and the

objection we get is I've never done anything wrong, I've still never done anything wrong.  And, by the way, they even said in there but if I violated an order, that would be grounds for a dismissal.  They already violated the order.  Your Honor already found they violated the order.  And yet here we are again.  We're here again with yet more repeated conduct of the same nature and different conduct this time.  We're now here with discovery misconduct.  We're here with the privilege log and the document production issue.

And I think Your Honor also hit the ultimate point which is the plaintiff's counsel cannot control him.  Because I think, as Your Honor has duly put, Your Honor said a few times that, well, plaintiff's lawyer finally got through to him and backed down the privilege claim.  That was after months and months and months and months of this privilege claim being out there.  We've both had to file motions to compel and it was the day before his objection was due.

So all of these things -- and we've obviously been taking these things individual today, the document production, the privilege log issue, but they must be viewed cumulatively.  And when they're viewed cumulatively, not just with everything we're here today -- any alone standing individually is, by the way, sufficient

to dismiss this case.  But when you take them cumulatively and add to that all of the history that brought us here today starting with our first motion to dismiss, rolling through our second motion to dismiss and Your Honor's memorandum of decision on that, the only option left is dismissal with prejudice.

Let me make sure I didn't miss anything, Your Honor.

(Pause.)

MR. GOOLEY:  Thank you, Your Honor.

THE COURT:  Thank you.

Attorney Weller.

MS. WELLER:  Thank you, Your Honor.

When we were here on the first motion to dismiss, plaintiff's counsel said, "This is a square peg in a round hole.  Usually cases are dismissed for discovery abuses, delays in the proceeding."  Well, here we are.  And now we have a round peg, round hole.

Those five factors that our Second Circuit asks to look for, we could tick them all off.  Your Honor's familiar with them so I don't have to go through them. Every single one of those factors cry for dismissal in this case.

The delay, it's undeniable.  And again, as Attorney Gooley said, you take them separately, but

together it has caused more than a year of delay.  We served interrogatories --

THE COURT:  I will indicate for the record at least the last six months is on me, because I sua sponte stayed this case in light of this motion.

MS. WELLER:  We served interrogatories and requests for production in 2020 seeking all recordings. If you put aside the four years' delay because the case went to the Second Circuit and the Supreme Court, we got a response in May of 2024.  We did not receive the recording until February of 2025.

A smaller point, but we served Dr. Soeiro with a request, a very broad request for all records in June of 2024.  And in late July of 2024 Dr. Soeiro said, "I've been in contact with Mr. Khan and I'm ready to provide you with a treatment summary consistent with the release of information agreement he signed and provided to me directly."  Mr. Khan is cc-ed on this email.  "Best wishes," and he gives his name.

By itself in another case, other plaintiffs, that may seem innocuous.  But here it raises all sorts of questions.  What did Mr. Khan send to him directly?  Our office already sent a broad authorization.  What did they discuss?  Mr. Khan's attorney said, yeah, the doctor said that, but he's lying.  And it's another example of

everybody is lying but Mr. Khan.  Everybody is trying to manipulate the system but Mr. Khan.  That can't be true. And there, when the release went out in June, we did not get the records, Your Honor, until late October.  And that was after Mr. Taubes in late September re-sent the authorization to the doctor and said I represent Mr. Khan, please use this authorization, get the records.  And we got the records.  Yet another delay.  Yet another attempt to control and manipulate and obfuscate and pull the wool over the Court's eyes.

The Mr. Roe privilege, the idea that you can't send some documents that are unprivileged and withhold or redact the others least you risk waiving it is ridiculous. We do it all the time, this is non-privileged, these are privileged with redactions or privilege withheld.  Plus documents were sent between the two of them.  A delay. And what troubles me the most is I still don't know what's hiding behind the documents that are still in the privilege log because they have those same anodyne, innocuous descriptions of post-trial logistics, FACE communications.  They're meaningless now, and I think they are now meant just to hide and block because that's what they did with the Roe communications.

THE COURT:  Had these -- had the privilege logs been teed up for Judge Garcia yet?

MS. WELLER:  We filed the Roe motion to compel, but that hasn't been ruled on.

MR. GOOLEY:  Honestly, Judge, I forget exactly where we were.  Obviously, we think Your Honor should dismiss the case.

I would say this.  If for any reason Your Honor didn't dismiss the case, I think, in light of what's transpired, in light of what's in this Peter Roe privilege log, I would want an opportunity to go back and look at everything over again because, you know, statements that, you know, this is the description of a privilege log entry, I don't know, might sound kind of, as Attorney Weller said, innocuous or proper but, you know, I'm looking at a 28-page communication that was claimed as privileged with Peter Roe and basically the entire thing is about planning a sexual encounter with Sophie.  I think, to be honest with you, I would say nothing's been teed up because, as I stand here today, I certainly am not willing to waive or potentially waive any rights to go back and say in light of everything we're here to talk about today, I basically want a do-over to challenge privilege logs, maybe entries I didn't challenge the first time.

MS. WELLER:  I -- it's coming back to me.  So the Peter Roe was teed up for Judge Garcia, but then the

plaintiff did produce the Peter Roe.  We then went through it.  But I think the case by then was stayed or the discovery was stayed.  So, no, we haven't teed up the rest of the items on the privilege log.  I do think the plaintiff did file a privilege log motion to compel -- at least one or two motions to compel against Yale which have been teed up but not fully adjudicated.

THE COURT:  Thank you.

MS. WELLER:  When we were here back before Your Honor in July of 2024 on the first motion to dismiss, one of the things Your Honor said was that plaintiff might be doing what he is doing to taint and influence the jury pool.  I think now more than a year later it's pretty clear if that is not his intent, that will be the result if this case is not dismissed.  The constant just feeding of social media about this case, about Jane.  And if the case is just dismissed to Jane, she's still an important part of this case.  She could still likely be a witness.  It will still taint and influence the jury pool as to Yale and to the Yale defendants.

I think, in sum, we've mentioned the prejudice that this has had on the Yale University, but more so those individual defendants, some of whom are struggling just to keep with their memory.  And here we are 16 years after the fact.

Plaintiff has said repeatedly in his posts he's at war with Yale. I believe him. I take that to be true that that is his belief, that he is at war with Yale and he is using this case, this courthouse, Your Honor, and this whole entire process to wage that war. I ask that Your Honor dismiss this case.

THE COURT: Thank you.

Attorney Taubes, before you respond, there was something I did want to correct. Named defendant Halloway actually went -- tell me if I get this wrong -- from Yale to Rutgers, not from Rutgers to Yale. And now I think is not even at Rutgers anymore. Just wanted to make that clear.

Attorney Taubes.

MR. TAUBES: Thank you, Your Honor.

I'd just like to start by thanking Your Honor for giving Mr. Khan the opportunity to be heard today. This is a matter very, very important to him. His life is completely and irretrievably changed because of him not being able to obtain his education that he went to school for at Yale University as a result of the allegations that have been made against him.

And there have been comments made today that I have no control over my client. I strongly disagree with that. It's actually pretty rare that I can get a client

A-383

to give up all of his personal devices, all of his social media passwords and user names and give them not just to me but to the vendor that Yale University uses to do E-discovery to extract all of the information, both good and bad information, information that harms his case quite a bit as well as information that might possibly help, and to provide all of that information to Yale for them to have, quite frankly, more of an understanding of all of his personal files, effects, and papers and documents than I have for anybody I've been seeking or that I've ever had a plaintiff have give up in a case. And then turning even to things like the doctors, we've made no objection to the scope and breadth of these releases which they admit are broad releases seeking all of the records from all of his doctors. And Mr. Khan has signed them. Not just for this one doctor who came in and said I'm not going to provide it, which he ultimately did, but for all of the doctors he's seen, for everywhere he's gone, as well as tax records, everything.

So when it came to the transcript, it took months. I was keeping in touch with them every step of the way. Delay obtaining a court reporter. The court reporter taking the time to do it. Me then having to redact it while doing a hundred other things. There was never any intent to delay anything with regards to the

transcript or the doctors or their records or producing emails and documents to the other side.

And at the same time that we were working very diligently to be forthright with the defendants and provide them with all of the information that they were requesting, which was extremely broad -- I mean, I've had meet-and-confers where they say we want to know where he laid his head every single night from 2015 to the present, if he stayed in a hotel in Omaha, Nebraska, for a two-night stay in 2024, we want to know.  So I was taking them at their word and working very hard to not have it come to this Court as a dispute about how much is Yale entitled to.  I've given them troves of information, troves of damaging information.  That's because I have control over my client, because he does want to comply with the Court's orders and comply with the rules of discovery and get his case to the merits so that he could potentially clear his name.

He was found not guilty in a rule of law of the criminal accusation that one of these defendants made against him.  But as we all know and has been said many times, being found not guilty of a criminal accusation is not a finding that you didn't do it.  And so there's never been any true vindication of my client.  And that is deeply, deeply important to him as an immigrant to this

country, who wants to be a citizen of this country, that he have the opportunity in this country's courts to be heard on the merits of his claims.  So we've done everything we can to provide them.

THE COURT:  Let me ask you something, Attorney Taubes.  I could not agree with you more that a not guilty verdict obviously does not mean that it was a false accusation.  It means very specifically the state did not prove the accusation beyond a reasonable doubt.

And the adjudication of whether -- this is a defamation case.  The adjudication of whether that was a false accusation when made to Yale is presumably at the heart of the merits of this case.  And your argument is that that's where he wants to get.  But the record before me is that he has gone out on social media and he has trans -- not transformed, that's not the right word.  He has identified the not guilty verdict as conclusive that the allegation that Jane made was not true.

MR. TAUBES:  I think that's a common tactic in a -- when you're trying to repair your reputation and you're trying to put out a public face, that you point to a thing that a common person can kind of latch onto.  You and I both know it means something different.  But to a common person, being found not guilty is somewhat of a vindication.

THE COURT: My point is that the record before me would suggest that he doesn't -- his goal is not to have that question answered in a court of law. His goal is to try this case in social media because at this juncture his case is in serious trouble.

MR. TAUBES: And I respectfully disagree with that because I believe that it is not his goal to litigate this case in social media. He did share the interview that was done, but keep in mind the interview was done many months before he shared it. And he shared it when it was released. He has friends and family he never gets to see all around the world, they get to see him in an interview being treated by someone who is on his side, not treating him like he's a criminal or a rapist but saying maybe there's something more to this. This is a big case, it's an important case, people care about it. He's proud of the fact that he can stand up despite everything that's happened to him with his head still held high. And I think that the problem that we have here is that anything he says about his case is going to bring about the result that Your Honor -- that we don't want -- that none of us want to see of her being outed. But --

THE COURT: None of us? That might be a stretch.

MR. TAUBES: He wants to do it in a lawful way

and he wants to have it open in a lawful way just like Yale wants my client's name released in a lawful way in another one of my cases and it's at the Second Circuit right now. We all have desires for effecting legal change, but he wants to do so through legal change. And in this situation, what we're talking about of people disclosing her name is going to happen even if he makes no comments on the media. If he makes zero comments, people are going to be disclosing the name.

THE COURT: That may be true.

MR. TAUBES: And it's actually very, very prolific how many different prominent blog posts, including if you read Your Honor's -- one of Your Honor's decisions on the motion to dismiss. Reading one of Your Honor's decisions on the motion to dismiss could lead a discerning reader to Jane Doe's name. It's a fact. By reading of the timing of the posts and everything, you can be brought to exactly one of the exhibits that they filed under seal by going online to going on X. And that's just the unfortunate reality that her name is well-known. It does not mean that he intends to cause people to do this thing that they're doing regardless of what he's doing. He does not intend to do that. He does not intend to fight this case in social media. We wants to fight this case in a courtroom. That's all I know how to do,

Your Honor.  I'm not a social media warrior.  I'm a court lawyer.  We have intended throughout this case to fight this case in court according to the rules of law and evidence.

THE COURT:  Thank you.

MR. TAUBES:  Thank you.

MR. SCONZO:  Judge, may I be heard very briefly?

THE COURT:  Yes.

MR. SCONZO:  When Mr. Khan took the stand, one of the questions you asked him was:  Did you tell Mr. Pattis that you were recording the UWC proceeding?  You had asked that question before the break.  And the answer from Attorney Taubes was yes, that he had told Attorney Pattis that.  In response to Your Honor, though, the answer was different.  Rather than just forthrightly saying yes, I told Attorney Pattis that, the answer was this stuttering, well, my phone was on and, I don't know, I guess he saw my phone was on.  That is the perfect example of the lack of candor and credibility with which we've been dealing for this whole case.

You ask him about the disclosure or lack of disclosure of the prior eight women, eight women who had accused him of sexual misconduct.  He didn't say, he didn't have the candor to say in this courtroom, Hey, I'm sorry, Judge, I should have disclosed that eight other

women accused me of sexual misconduct. Instead, he engages in this mental gymnastic. That is what has occurred, continues to occur, and Attorney Taubes either refuses to deal with it or can't. And I think it's because he can't. So the only possible outcome here, Judge, is a dismissal of this case because there is no control over Mr. Khan. Zero. Thank you, Your Honor.

THE COURT: Thank you.

MR. TAUBES: If I may, Your Honor --

THE COURT: Of course.

MR. TAUBES: -- a brief response.

I thought that Mr. Khan's answer to your question regarding him making his attorney aware of the recording was very forthright. When you asked me, you asked me if Mr. Khan had told Mr. Pattis, and Mr. -- in the heat of the moment, he whispered in my ear something along the lines of Mr. Pattis knew. And so I answered the question yes. I wasn't intending to say that the exact way that he said it was by telling him as opposed to the phone being out and being on and recording, but I think that Mr. Khan provided that detail forthrightly to you in your answer and that that was clear what his answer was. And I think if there was any ambiguity about it --

THE COURT: Well, it's clear that he has assumed that Mr. Pattis put two and two together.

(Plaintiff's counsel confers with client.)

MR. TAUBES:  We didn't get into the details because I think Your Honor moved on to another point.  But he's indicating to me that it was very much explicit awareness.  And again, we didn't get into the details that much, but there was no lack of candor there or lack of forthrightness.  It's just a matter of the difference in the question that you asked me versus the question that you asked him.

With regards to the saying that he's sorry, I don't think that he was asked whether he feels remorseful about the interrogatory answer not being perhaps fair, but I think that it was clear that it was based upon a misunderstanding as well as things he had not remembered and that it was not him intentionally trying to deceive the Court.  I don't believe that he was intentionally trying to deceive the Court or the opposing parties.

And I do believe that he has been very cooperative with me in discovery.  I've had many clients who are very uncooperative in discovery.  I've had cases I've had to dismiss because clients won't give me information I know the Court will require.  And if they don't provide, the case is going to be dismissed.  But every time I've asked Mr. Khan to do something, even things I know he doesn't want to do like give information

and documents that are harmful, he has cooperated because he does want this case to be decided in a court of law. Thank you.

THE COURT: Thank you.

Obviously, I'm going to reserve. I'm going to go back into the briefing and all of the exhibits. The case is going to remain stayed. I will try to move as quickly as possible.

It is troubling to me, Attorney Taubes, that you suggested certain facts without checking them. It would have been easy enough to call Attorney Charnin and say did you tell him not to redact the state court transcripts, especially since Attorney Formica had already been produced as that person and he made clear that he did not give that advice. And Judge Garcia has already concluded that representations to the contrary from your client were not right. And it is troubling -- I mean, as I sit here, I feel like I need to ask Norm Pattis. Because the idea that he litigated this case for as long as he did on the representations that were being made knowing that that proceeding was recorded is remarkable. And maybe we reconvene and I make arrangements for Attorney Pattis to be here. Maybe we reconvene and I make arrangements for Attorney Charnin to be here. Because your client has, I think, on more than one occasion over the course of this

litigation been deceptive. And I've already made that finding. And I've already made factual findings about his intentions in terms of his social media use, findings which he clearly disagrees with but findings that I'm not going to revisit, and he just ignores them.

This is the third motion to dismiss based on litigation misconduct. He is accused of violating the Court's order. He is accused of abusing the judicial process, basically using this litigation as a cudgel to harass Jane Doe and otherwise delay and obfuscate the issues in this case.

He proceeds on social media to his followers that his narrative is true and conclusively established by the not guilty verdict, and he could not be more wrong. It would be one thing if he were just denying the accusation. That's his right. I have no problem with that. But when he puts forth the not guilty verdict as vindication, he is potentially tainting the jury pool, he is frankly stating something that's not right. The not guilty verdict doesn't mean that her allegations were false. It just doesn't. These are defamation claims that have not been adjudicated. The question of whether her allegation was false has not been adjudicated. And it appears -- and I'm not concluding this, but one of my concerns is that rather than risk an adverse

adjudication -- and again, it would be here if we had a trial where it would be decided, the specific issue -- he instead ops to try the case on social media. That's one set of conclusions that can be drawn from this record. I'm not -- I have to go back and look at everything before I decide what the right thing to do here is.

On top of that, we have other layers. We have allegations of discovery misconduct. And I have -- I think in my last decision, I basically said I didn't have a specific sanction except to conclude that the defendants were going to have free rein on cross-examination to explore all of these allegations of misconduct. And the record that he has continued to build in that effort continues to fuel what would be at this point an extraordinary and perhaps significant and persuasive cross-examination that your client is not one to be believed. But I don't think simply acknowledging that he's now made things even worse for himself is the answer. I don't know what the answer is because I haven't decided this motion. But with every misstep -- and I will tell you those interrogatories are a huge misstep. And the idea that he just unilaterally decided what was going to be disclosed and what wasn't going to be disclosed is a huge problem. And the arbitrary limitation he put on his answer sounds very much like an after-the-fact

justification when his untrue answer came to light.

It is always my goal to get a case adjudicated on the merits, but it's also crystal clear that a plaintiff can forfeit that right through misconduct. And that is, I think, the decision that's been teed up for me. It's one, frankly, I wish I didn't have to make.

So with that --

MR. TAUBES: If I may, just one last thing, Your Honor. There's been a lot of discussion today about the motion that was written by me not containing any sort of acknowledgment of the prior misconduct and the Court's prior orders. That had nothing to do with Mr. Khan, for the record. I was just focused on -- when I'm saying he did nothing wrong, I'm focused on what the subject of this motion was.

THE COURT: The current allegations.

MR. TAUBES: I never -- I never meant to not acknowledge and respect this Court's prior orders in the briefing. I was just trying to be concise to the point to address the allegations that were being at that time. So please do not take the writing of the brief as my client's lack of remorse about his prior misconduct that you found. That was really my error as well.

THE COURT: Fair enough. Thank you.

Anything further we can do this afternoon from

the plaintiff?

MR. TAUBES:  No.  Thank you, Your Honor.

THE COURT:  For the defense?

MR. GOOLEY:  Not from Jane, Your Honor.

THE COURT:  Yale?

MS. WELLER:  No, Your Honor.  Thank you.

THE COURT:  We're in recess.

(Proceedings adjourned at 12:58 a.m.)

**A-396**

104

C E R T I F I C A T E


RE:   SAIFULLAH KHAN v. YALE UNIVERSITY, ET AL.
No. 3:19CV1966(KAD)


        I, Diana Huntington, RDR, CRR, Official Court Reporter for the United States District Court for the District of Connecticut, do hereby certify that the foregoing pages 1 through 103 are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.


                    /s/
        _____

                DIANA HUNTINGTON, RDR, CRR
                Official Court Reporter
                United States District Court
                141 Church Street, Room 147
                New Haven, Connecticut 06510
                    (860) 463-3180


**A-397**